Gardiner, J.
 

 The material question, as stated by the court below, is whether the bill in question was transmitted to Smith
 
 *383
 
 & Co. for collection merely, 9^ was to be credited to the plaintiffs, when received by the former, whether collected or not. As the bill was endorsed in blank by the plaintiffs, the legal title passed to Smith and Co. prima facie, and the plaintiffs must establish the fact that it was endorsed and forwarded for the purpose of collection.
 

 If this was a question of fact, proper to be submitted to the jury, their verdict for the plaintiffs has disposed of the whole question, and there is nothing to review. If, however, it was a question of law arising upon facts undisputed, then the infer- ' ence should have been drawn by the court, and the motion for a nonsuit will present it for our consideration.
 

 Two witnesses were called by the plaintiffs, as to the course of dealing between them and Smith & Co. of N. York. There is no discrepancy in their testimony, and both parties assume the evidence as true in every particular. Whether, therefore, it establishes the agency for which the plaintiffs contend, would be a question of law, and so the learned court, in their opinion, seem to regard it. From one of the witnesses we have the facts that funds were transmitted by the plaintiffs to be drawn against, or held subject to their order. From the other, that Smith & Co. received drafts, checks and notes, to be placed to
 
 the credit
 
 of the plaintiffs, who generally drew against the fund, unless special directions were given ; that the remittances of the plaintiffs were account (I,) and those of Smith & Co. account (2;) that on the 15th of May, the plaintiffs wrote the New-York house, enclosing $2496,08 in notes for
 
 collection,
 
 and $17,975,-62 in bank notes, checks and drafts, including the $7000 draft in question, for account (1,) and advised their correspondent, in the same letter, that they .had drawn upon them to the amouut of $20,832,26, at sight. The $17,975,62 was therefore transmitted to Smith & Co. to be placed to the
 
 credit
 
 of the Philadelphia house in account (1,) to be drawn against in the usual course of business. As the mode of dealing had been continued for years, and was perfectly understood by all parties, the plaintiffs had a right to draw against funds remitted, and Smith & Co.'were bound to accept. The whole fund was, by the course of dealing, and in this instance by the directions of the plain
 
 *384
 
 tiffs, treated as cash; it was passed to their credit according to their instructions, and the draft in question was for account (1,) in the same sense that the $541 in bank notes, contained in the same remittance. Lord Eidon seems to have been of opinion, that “ if the bills were entered as cash, with the knowledge of the customer, and he
 
 drew,
 
 ,or was
 
 entitled
 
 to draw, upon the banker, as having that credit in cash, he would thereby be precluded from recurring to the bills, specifically.”
 
 Story on Agency,
 
 § 228,
 
 note
 
 3,
 
 and cases.)
 

 The plaintiffs in this case
 
 drew,
 
 and were, as we have ssen, entitled fb draw, by arrangement. Their bills at sight amounted to $20,832,
 
 although the
 
 paper transmitted was only $20,-471,70, of which $2,496,08 was sent for collection, and not available under some days. There is no proof of the actual state of the accounts between the different firms on the 16th of May; but whether it was in their favor, or otherwise, can we suppose that the plaintiffs expected that their drafts would be dishonored, if the $17,000 in securities were not paid at sight ? The case is much stronger than that of a customer with a banker. The parties were exchange brokers; mutual correspondents ; receiving funds for, and making drafts upon, each-other. Unquestionably it was their intention to keep each other in funds to answer the bills, drawn by them respectively. But in case that the paper transmitted should, from accident, or any other cause, be unavailable, a principal object of the ar.rangement was to prevent these drafts from being returned dishonored, by making it the duty of their correspondents to "accept and pay, notwithstanding. Each would be safe in so doing, because they would have the responsibility of all the parties to the paper, including the firm whose drafts they were
 
 to pay.
 
 The whole arrangement was one of mutual convenience; and to hold that such drafts were transmitted for collection merely, with no right to a credit, or to draw against them, until they were actually paid, is to lose sight of the situation of these brokers, their business, and its necessities.
 

 It is probably true, that Clark & Co. expected the $17,000 in securities would be available on the 16th of May; but if unavailable, the plaintiffs’ witness says, it was a fund to be drawn
 
 *385
 
 against; for it was for account (1;) not when collected, but in the state in which it was transmitted. Account (2) was kept in the same manner, and on looking at the letter of the 15th of May, we find about 13000 in stocks (not the cash proceeds) credited at par and the discount debited. The securities, as we learn from the clerk of the New York house, were to be placed to the
 
 credit
 
 of Clark & Co., unless other directions were given, and were generally drawn against. It would be a singular mode of transacting business, to give credit for securities, and allow the funds thus constituted to be drawn against, and the drawer at the same time to retain the entire legal or equitable interest in the securities, of which the fund was composed.
 

 The error of the learned judge, I apprehend, consists in ■ the assumption, that nothing went into account (1) properly; or, what is the same thing, nothing was credited to Clark & Co. in the course of business, until collected. This inference is opposed to the testimony of the only witnesses who speak as to the nature of the' business, and mode of transacting it, and to instructions of the plaintiffs in the letter of the 15th of May. How are we to account for the different instructions in reference to the two drafts forwarded for collection, and the other funds, upon the supposition that neither were to be credited in account (1) until collected, and when collected, both would be thus credited in the ordinary course of business ? Why distinguish, when all were sent for collection only, and when the credits were to be given on the same contingency, and the rights of the parties were precisely the same, in reference to both classes of securities ?
 

 We think that these different firms were agents and bankers for each other. This is proved by the course of business. The letter of the 15th of May covered securities for account (1,) and for collection, together with an order to receive bills of exchange, and hold them, until the return of Mr. Underwood. For the first class they were to be credited, with the right to draw upon their correspondents; as to the second and third, the N. York firm were the mere agents of the plaintiffs, and had no other interest in, and control over, the assets, than such as were necessary to the discharge of their agency; that the title to the
 
 *386
 
 bill in controversy, under the circumstances disclosed by the evidence, vested in Smith & Co. upon its reception by them; and that their application of the proceeds to the payment of their own debt cannot be questioned in a suit against creditors receiving them in good faith.
 

 The judgment of the superior court must, therefore, be reversed.
 

 Judgment reversed: