In re NORTHRUP et al.

(District Court, N. D. New York. March 20, 1907.)

1. BANKRUPTCY—WRONGFUL CONVERSION OF TRUST FUNDS—RIGHT TO RECLAIM.
Where a bank acting merely as collection agent for another bank under an agreement by which it was to remit the proceeds of all collections as received, without authority to credit the same on its books, made a collection and mingled the proceeds with its own funds, and became bankrupt without having remitted the same, so much of its cash at least as remained on hand at all times between the date of the collection and the bankruptcy, and came into the hands of its trustee, will be presumed to be proceeds of the collection, and may be reclaimed by the bank owning the collection as its property.

2. SAME—EQUITABLE SET-OFF—POWER OF COURT TO ENFORCE.
Bankrupts as partners, doing business as a private bank, had an agreement with claimant bank by which each bank was to act as collection agent for the other, remitting the proceeds of all collections made without charge or credit. The bankrupts made an assignment, and were subsequently adjudged bankrupts, having a short time previously collected a draft sent them by claimant, the proceeds of which they had not remitted, but mingled with their own funds. At the time of the assignment they had certain collections in the hands of claimant, and between themselves agreed that the collections as between the two banks should be considered a "stand-off," and they did not list claimant as a creditor, nor schedule the collections in its hands as assets of their estate in bankruptcy. Claimant, however, having made the collections sent it, in ignorance of the assignment, or that its own funds had been converted, in accordance with its agreement remitted the proceeds of such collections by drafts which were received and collected by the assignee, the proceeds afterward coming into the hands of the trustee in bankruptcy. On learning the facts, claimant accepted the set-off intended by the bankrupts, and demanded a return of its drafts or their proceeds, which being refused it applied for an order directing their return by the trustee. *Held*, that it was competent for the bankrupts to restore so much of the claimant's funds they had wrongfully converted by applying thereon the proceeds of their own collections in claimant's hands, and for claimant to accept and ratify such intended substitution upon learning of it, instead of attempting to trace and reclaim its own funds, and that the court in the exercise of its equity powers could carry such completed agreement into effect by directing the return of the proceeds of the drafts.

In Bankruptcy.

This is an application by the National Bank of Syracuse for an order directing the trustee in bankruptcy of Walter E. Northrup and Robert A.

Hill, as copartners under the name of the Central Bank, doing business at Oneida, N. Y., to pay over to it the sum of $796.23, the amount of certain drafts sent by the National Bank of Syracuse to the said Central Bank in payment of certain collections it had made as agent for said Central Bank, but which had not been received by it at the time it made a general assignment for the benefit of its creditors. The same were received by the assignee soon after such assignment, and collected by him, and the proceeds thereof have been paid over to the trustee in bankruptcy.

Mackenzie & Wade, for the application.

E. Leland Hunt, opposed.

RAY, District Judge. The National Bank of Syracuse at all the times mentioned was incorporated and doing business as a national bank under the national banking laws, and had its principal office and place of business in the city of Syracuse, N. Y. Walter E. Northrup and Robert A. Hill were copartners, engaged in a private banking business under the name of Central Bank of Oneida, N. Y., and they had their office and principal place of business in the city of Oneida, N. Y. An agreement was made between the two banks under and by the terms of which each was to receive from the other, for collection simply, such paper as should be sent to it for that purpose. It was the agreement that, when collection was made, the proceeds of the paper collected should be immediately remitted to the one sending the paper for collection. No charge was made and no credit given. The relation of debtor and creditor was not to arise. The relation was that of principal and agent purely. The parties acted under that agreement, and it is conceded that such was the relation existing between the parties. Each bank kept an account of the paper so received for collection and of remittances made.

June 16, 1905, under this agreement, the National Bank of Syracuse forwarded to the Central Bank of Oneida for collection and remittance a certain draft for the sum of $1,170.29, which draft was drawn on one Robert Paul, of Oneida, N. Y. On the 17th day of June, 1905, the said Central Bank presented the draft to Paul for payment, and received from him in payment thereof the sum of $1,170.29. Nine hundred sixty-five dollars and ninety-eight cents of this sum was paid in cash, and the balance by certain exchange items. The Central Bank had the benefit of the same, and presumably the cash paid went into its vaults and became a part of the cash on hand. The identity of the money as such was therefore lost. It was no longer capable of exact identification, but it was money which it was the duty of the Central Bank to transmit to the National Bank of Syracuse, which had the title thereto. On the 27th day of June, 1905, the said Walter E. Northrup and Robert A. Hill, both individually and as copartners under the said firm name, made a general assignment for the benefit of their creditors to one H. C. Stone, who qualified and took possession of the assets of said Central Bank and of said individuals comprising said firm. At the time such assignment was made and the doors of the Central Bank were closed there was in the said bank cash to the amount of $502, but between the day when said Paul draft was collected and the closing of the doors of the Central Bank its cash had been reduced to the sum of $247, so that the said Central Bank had

actually appropriated to its own use all of said money except the sum last stated. There was no communication between the two banks in relation to such collection or the remittance of the proceeds. The Central Bank did not remit the proceeds of the Paul draft, and the proceeds have not been remitted or paid over since. From June 20 to June 26, 1905, inclusive, the National Bank of Syracuse received from said Central Bank for collection and remittance under said agreement and collected items amounting to $540.50 and also another item of $255.73. There was no communication between the parties as to the collection of these items or the remittance of the proceeds. As a necessary consequence, these moneys belonged to the Central Bank, and there was no right of offset, or to balance accounts, or to strike and remit balances, by the terms of the existing agreement. June 27, 1905, and before the Central Bank made the assignment referred to, the National Bank of Syracuse in 'due course of business, and in ignorance of the facts that the Central Bank was financially involved, or about to make an assignment, or that it had, in fact, used or appropriated any part of the Paul draft collection or that same had been collected, but assuming, of course, that it would remit the proceeds in due course of business, made and left for mailing, and about 6 o'clock p. m. of that day and after the Central Bank had closed its doors, but before the assignment was executed, mailed to the said Central Bank, two drafts for the amount of such collections made by said First National Bank of Syracuse, viz., one for $540.50 and the other for $255.73. These drafts were received by said assignee, H. C. Stone, June 28th, duly indorsed by him, forwarded for collection, and paid by the Bank of America of New York City, on whom drawn, before the First National Bank of Syracuse could stop payment thereof, which it, with due diligence, endeavored to do on learning of such assignments. June 29, 1905, an involuntary petition in bankruptcy was filed against the said firm (called "Central Bank") and the individuals comprising same, and H. W. Coley was appointed receiver of their property, etc., by the District Court of the United States in such proceedings, and July 29, 1905, they were duly adjudicated bankrupts accordingly, and thereafter said Coley was duly appointed trustee of such bankrupt estates. The cash in said Central Bank when such assignment was made, $502, and the proceeds of such drafts for $540.50 and $255.73, respectively, received by said assignee, were paid over by the said assignee to said receiver and by him to such trustee, and he now holds same. It was given in evidence, and not disputed, that before closing its doors and making the said assignment, but on the same day, Northrup and Hill, composing the firm, had a conversation between themselves, in contemplation of the assignment, in which one asked the other how they stood with Syracuse, referring to the First National Bank of Syracuse, and the reply was that Syracuse owed them as much as they did Syracuse, and the partner making the inquiry then said, "Then that is a stand-off."

It is contended (1) that under these circumstances there was such a mistake of fact inducing the forwarding of the drafts to the Central Bank June 27th that title did not pass, and this court, in equity, may and should direct their return or the return of the proceeds; and

(2) that, if this cannot be done, the First National Bank is entitled to the cash in the Central Bank at the close of business June 27th, and which passed to the assignee and subsequently to the trustee and now in the possession of the court, or at least to the sum of $247, the least sum such Central Bank had after the collection of such Paul draft. There can be no question that under the agreement sustained by the course of dealing between the Syracuse Bank and the Central Bank the title to the Paul draft, as well as its proceeds, remained in the First National Bank of Syracuse. The title was in the Syracuse Bank under evidence in the case which I have not recited. Metropolitan Nat. Bank v. Lloyd, 90 N. Y. 530. It remained there for the reason that by special agreement the Central Bank was a mere agent to collect and remit. It could not by its own act and without the consent or acquiescence of its principal make itself the owner of the draft or of its proceeds. No such consent was shown, and there was no acquiescence in any such action as the Syracuse Bank was ignorant of what the Central Bank had done. The Central Bank did become liable to the Syracuse Bank for the conversion of its property, the proceeds of the Paul draft, to the extent it was converted, and Northrup and Hill also became criminally liable for grand larceny, but in no other sense did they or their copartnership become the debtors of the Syracuse Bank. True, that bank might have waived the tort and brought action for money had and received after knowledge of the facts. It might have waived compliance with the contract and the remittance of the proceeds of the draft, and given consent that the sum collected by the Central Bank be offset against the amount collected by it, but nothing of the sort was done by mutual consent or arrangement, and what the First National Bank actually did in remitting the amounts collected by it for the Central Bank to that bank when it knew the Central Bank had its paper for collection and which probably had been collected, or its proceeds, negatives any idea of such waiver and consent.

This is a plain case of honesty and integrity, and strict compliance with the agreement on the one part, and of dishonesty, malfeasance, and violation of contract and moral obligations on the other, in which honesty got the worst of it. If Northrup and Hill had informed the assignee, H. C. Stone, of the situation and of the obligations of the agreement and of their talk regarding "the stand-off," and had provided in the assignment for the protection of the Syracuse Bank in case it had remitted or should remit before obtaining knowledge of the assignment, or had requested the holding by their assignee of any such remittance in case it should come until the Syracuse Bank could take measures to protect itself, the case would be stripped of some of the rascality and felonious intent shown. The speed with which the assignee secured payment of the drafts in question may display mere business diligence. But, if so, this fact in no way ameliorates the acts of Northrup and Hill. It is a case where the Syracuse Bank should be protected if protection can be afforded without doing violence to the law and without injury or injustice to others. The First National Bank of Syracuse was guilty of no wrong, no laches. It simply observed its own contract obligations with strict business fidelity and

honor notwithstanding the delay of the Central Bank in accounting for the Paul draft sent to it for collection and remittance June 16th. In order to follow and recover or reclaim trust funds improperly disposed of by trustee or agent, it is generally necessary to identify the same. But such identification need not be absolute and complete as between the trustee and cestui que trust, or as between principal and agent. And there is no presumption the trustee or agent has actually converted, misapplied, or wrongfully disposed of the trust funds shown to have been in his hands. The presumption is the contrary. Tracing and identifying is a matter of evidence. Then, has the First National Bank of Syracuse traced into the possession of Northrup and Hill (the Central Bank) and sufficiently identified any of the proceeds of the Paul draft? June 17, 1905, they received the money, and, so far as the evidence shows, they at all times thereafter had $247 on hand. This is sufficient identification to that amount. It is not shown to be money other than the proceeds of the Paul draft. There is no presumption that any of such proceeds were misapplied; but that it was misapplied in part is shown by the absence of all but $247 thereof. The proceeds of the Paul draft went into the Central Bank with the other funds belonging to that bank, and is presumed to have remained there, not having been paid over to the Syracuse Bank; and it is immaterial that such proceeds were mixed with other funds of such Central Bank. They did not lose their character. Roca v. Byrne, 145 N. Y. 182, 189, 190, 39 N. E. 812, 45 Am. St. Rep. 599; Van Alen v. American Nat. Bank, 52 N. Y. 1; Importers' & Traders' Nat. Bank v. Peters, 123 N. Y. 272, 25 N. E. 319; Pennell v. Deffell, 4 De Gex, M. & G. 372; Veil v. Mitchell, 4 Wash. C. C. 105, Fed. Cas. No. 16,908; Hatch v. Fourth Nat. Bank, 147 N. Y. 184, 41 N. E. 403; Union S. Y. B. v. Gillespie, 137 U. S. 411, 11 Sup. Ct. 118, 34 L. Ed. 724; Nat. Bank v. Ins. Co., 104 U. S. 54, 26 L. Ed. 693. In Importers' & Traders' Bank v. Peters, supra, it was held:

"When money held by a person in a fiduciary capacity has been deposited by him in his general account at a bank, the party for whom the money is held can follow it, and has a charge on the balance in the banker's hands. If the depositor after such a deposit draws out sums by checks generally and in the ordinary manner, it must be presumed that he drew out his own in preference to the trust money. The rule attributing the first drawings out to the first payments in does not apply to such a case."

In Van Alen v. Am. N. Bank, supra, it was held:

"Where an agent deposits in a bank, to his own account, the proceeds of property sold by him for his principal, under instructions thus to keep it. a trust is impressed upon the deposit in favor of the principal, and his right thereto is not affected by the fact that the agent at the same time deposits other moneys belonging to himself; nor is it affected by the fact that the agent, instead of depositing the identical moneys received by him on account of his principal, substitutes other moneys therefor."

Here it is not shown that all of the fund belonging to the Syracuse Bank was drawn out and used by the Central Bank for its own purposes; and, a part having been restored, I am inclined to think the First National Bank of Syracuse is to be deemed the owner of all the money in the Central Bank at the time of the assignment. There is no proof it belonged to any other person or party. Why should not the

law so apply such balance of $502? I know of no principle of law which will prevent a wrongdoer from restoring a fund which he has misapplied. Why will not the trust attach to whatever balance the wrongdoer has in bank, even though it appears he has been drawing out and making deposits generally, so that the amount to his credit has at times been below the trust mark? The Syracuse Bank contends, however, that it is entitled to reclaim these drafts or their proceeds for the following reasons: First. The Central Bank, having the money of the First National Bank of Syracuse in its possession for remittance to it, and being short of funds, used the money of that bank for its own business purposes and by such act became liable to the First National Bank in the sum of $1,170.29 in an action for conversion or for money had and received to its use. Second. That having become liable to said Syracuse Bank in that sum which said Syracuse Bank could have recovered in a suit at law in either form of action suggested, and recognizing such liability, the Central Bank elected to pay the Syracuse Bank the amount to which it was entitled by appropriating to that purpose, and leaving with the Syracuse Bank certain moneys in possession of that bank which the Central Bank owned, and to which it was entitled, and which otherwise it was entitled to demand and receive from said Syracuse Bank. Third. That in legal effect this was a setting apart and an appropriation of the amount due from the First National Bank of Syracuse to the Central Bank to the payment and reimbursement of the trust fund misappropriated, and that, as this was done prior to the assignment, it only wanted the consent of the First National Bank of Syracuse to make it effectual. Fourth. That it is immaterial, no other rights having intervened, that the First National Bank of Syracuse in ignorance of this election of Northrup and Hill (the Central Bank) actually remitted the moneys due from it to the Central Bank; that the election having been made by Northrup and Hill, and not revoked or rescinded or nullified, the right of the First National Bank of Syracuse to consent and ratify this action and election became fixed; and that its right to the money in case it did consent and ratify followed the money in every form into which it had been transferred and into all hands, except those of a bona fide holder for value. Fifth. That neither the assignee for the benefit of the creditors of the Central Bank nor its trustee in bankruptcy obtained any greater right than the Central Bank (Northrup and Hill) had, and that such assignee and trustee took the drafts and their proceeds subject to the right of the First National Bank of Syracuse to ratify and assent to the election and action of Northrup and Hill above referred to; that is, to the appropriation of the money represented by such drafts to the payment of the sum due the Syracuse Bank. Sixth. That so soon as the First National Bank of Syracuse was informed of the facts, the use of its money by Northrup and Hill and their election to apply and appropriate the money held by it for them and due to them to reimburse the First National Bank of Syracuse and make good the fund, it assented, ratified, and approved such action, and that it is immaterial that such assent was given after the assignment and not before, and immaterial that no book entry was made, no communication sent to Syracuse, and that the money was not where the Central Bank

could handle it when such appropriation was made, that neither the assignee nor the trustee could repudiate or rescind, or by any act of theirs affect this right. Seventh. That, as the money represented by the drafts was actually in the possession of the Syracuse Bank when the Central Bank declared it an offset or stand-off, it was in legal effect an actual delivery thereof to the Syracuse Bank, and that the sending of the drafts was in ignorance of the actual facts.

If there had been no such agreement, only an open account between the two banks as to these transactions, one of debit and credit, and the Central Bank had credited the Syracuse Bank with the amount due from it, there can be no question this would have been an effectual appropriation of the money due from the Syracuse Bank to the Central Bank to the payment of the claim of the Syracuse Bank. In such case the Syracuse Bank could have followed and retained these drafts or their proceeds. I think it entirely immaterial in a case like this that no entry in the books was made. The question is: What did the conversation between Northrup and Hill followed by the action of the Syracuse Bank when it learned the facts amount to? That conversation occurred just before the bank was closed June 27th, and was as follows:

"Mr. Northrup asked me [Hill] how we stood with Syracuse. He said, 'This draft [referring to the Paul draft] has not been remitted for'; and K. told him that they [Syracuse Bank] owed us practically the same amount. Northrup says that is an offset, so there is nothing to that."

And later:

"Mr. Northrup says that is a stand-off; that is, an offset."

This must be construed either as an admission by Northrup that the amount due from the Central Bank to Syracuse was, in fact, an offset to the amount due it from Syracuse under some agreement or understanding, or as an expression of opinion on his part, or as an appropriation or application of that fund by Northrup and Hill to the restoration of the money misappropriated. There can be no doubt of their right to restore and make good the fund from any part of their own property. That it was, in fact, an offset is negatived by proof of the agreement and conduct of the parties in reference to these and other similar collections. If an expression of opinion, it was a mistaken one, both as to the fact and law. Does that conversation between Northrup and Hill and K. establish the proposition that they then and there appropriated or agreed to appropriate or set apart the amount due from the Syracuse Bank to the Central Bank to the payment or satisfaction, pro tanto, of the said claim of the Syracuse bank against the Central Bank or to the restoration of the fund belonging to that bank? No credit was given or written memorandum made, and no word was sent the Syracuse Bank. Equity sometimes regards that as actually done which ought to have been done; but can we extend or apply that doctrine to the facts of this case? There can be no question that Northrup and Hill understood the Syracuse Bank would and intended that bank should retain the money due them (the Central Bank) from it; that they understood that sum being in the possession of the Syracuse Bank did restore and make good to that extent the

fund it held for that bank. If the Syracuse Bank had not sent the drafts, and on learning of the assignment and other facts recited, including the conversation referred to, had refused to remit or pay over the amount of its collections made for the Central Bank, could the assignee, all the facts appearing pleaded as a defense, have maintained an action therefor? This seems a fair test. I do not think such action could have been maintained. Equity would say such money had already been applied by the Central Bank before the commencement of the action to the reduction of the claim of the Syracuse Bank for the conversion, or to the restoration of the converted fund, by the election to permit the Syracuse Bank to retain it for that purpose. Equity will regard the transaction as having been completed in accordance with the actual intent of the wrongdoers.

The situation is narrowed to this: The First National Bank of Syracuse, having in its possession certain moneys of the Central Bank received under an agreement with it, which the Central Bank intended it should retain, and supposed it would retain, and which it, in fact, had the right to retain, and which it would have retained but for the fact that it was ignorant of the wrongful transactions of the Central Bank hereafter mentioned done in violation of the agreement, and of its purpose to right the wrong by allowing such retention, sent such moneys forward to the Central Bank pursuant to the terms of such mutual agreement between them, but which had been violated by the Central Bank. The assignee of the Central Bank, in ignorance of such wrongs and of such intent and purpose that the Syracuse Bank should retain such money, or, if not in ignorance of the facts, in disregard thereof, received the money, and has passed it into the hands of a court having equitable power and jurisdiction over the fund. The Central Bank, acting under such mutual agreement, but being insolvent, having received moneys of the Syracuse Bank to a larger amount than was coming from it, wrongfully converted same to its own use, but intended and purposed and so declared that the Syracuse Bank should retain the said moneys in its hands as restoration, in part at least, of the moneys so converted. The Central Bank then made an assignment for the benefit of its creditors, and was then thrown into bankruptcy. The Syracuse Bank was ignorant of these facts and of the financial condition of the Central Bank when it sent the money in its hands forward. It was free from laches. Had it known such facts, it would not have remitted the money. In equity is the First National Bank of Syracuse entitled to a return of the money so remitted? While the legal title thereto was in the Central Bank in equity, it belonged to the Syracuse Bank. It was paid over in ignorance of its rights and without fault on its part, under a mistake as to the facts. The payment was induced and procured by the wrong of the Central Bank in not notifying the Syracuse Bank of the facts, and the money was secured by its further wrong in not notifying that bank of its assignment, and in not advising its assignee of the truth. Every equity demands the return of this money, the proceeds of the drafts sent by the Syracuse Bank to the Central Bank and received by its assignee and turned over to the receiver in bankruptcy and then to the trustee and now in this court for distribution, to the First National

Bank of Syracuse, or the turning over to it of the $502 in the Central Bank when it closed its doors. This court cannot lead itself to the consummation of a grand larceny of the funds of that bank, or permit its officers and agents so to do or to profit from such a transaction. Having concluded to close their doors, being insolvent, and having concluded to treat the amount coming from the Syracuse Bank to them as a valid offset and substitution for the amount coming from them to the Syracuse Bank because of their failure to remit instead of remitting the balance in their hands $502, as honesty and business integrity required them to do, and having declared such intention, suppose that thereafter, and before they made the assignment, the drafts in question had been delivered to them by a messenger, would Northrup and Hill have been justified in receiving and retaining and collecting same as their own, and in retaining the proceeds thereof? They would have had the legal, but not the equitable, title thereto. It would have been their duty to restore such drafts or the proceeds. Equity would have enjoined their collection by the assignee of the Central Bank, or would have compelled their return if demanded by the Syracuse Bank on being informed of the facts. I think and hold that, when the Central Bank (Northrup and Hill) determined to close their doors and declared their purpose to consider and treat the money coming from the Syracuse Bank to them as "an offset" or a "stand-off" to the money in their hands belonging to the Syracuse Bank which they had converted to their own use, it amounted to substitution of that money in place of the money so converted, and impressed it with a trust in favor of the Syracuse Bank, which this court in equity and good conscience should recognize and enforce. It is the same as if they had put the converted money into some security or bank in their own name for that purpose. The substituted money was in the hands of the Syracuse Bank, and the declared intent of the owners, Northrup and Hill, was that that bank should retain it as an applied offset or "stand-off." This made the First National Bank of Syracuse the beneficial owner. In effect, it is the same as though Northrup and Hill had set apart so much money belonging to them in place of and to reimburse the converted fund. As the money so substituted then equitably belonged to the Syracuse Bank, the rules declared in 3 Pomeroy, Eq. Jurisprudence (3d Ed.) pp. 2013, 2015, §§ 1047, 1048, come into play, viz.:

"Sec. 1047. (2) Money Received Which Equitably Belongs to Another. By the well-settled doctrines of equity, a constructive trust arises whenever one party has obtained money which does not equitably belong to him, and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it; as, for example, when money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust, or violation of fiduciary duty, and the like. It is true that the beneficial owner can often recover the money due to him by a legal action upon an implied assumpsit; but in many instances a resort to the equitable jurisdiction is proper, and even necessary.

"Sec. 1048. (3) Acquisition of Trust Property by a Volunteer, or Purchaser with Notice. Wherever property, real or personal, which is already impressed with or subject to a trust of any kind, express or by operation of law, is conveyed or transferred by the trustee, not in the course of executing and carrying into effect the terms of an express trust, or devolves from a trustee

to a third person, who is a mere volunteer, or who is a purchaser with actual or constructive notice of the trust, then the rule is universal that such heir, devisee, successor, or other voluntary transferee, or such purchaser with notice, acquires and holds the property subject to the same trust which before existed, and becomes himself a trustee for the original beneficiary. Equity impresses the trust upon the property in the hands of the transferee or purchaser, compels him to perform the trust if it be active, and to hold the property subject to the trust, and renders him liable to all the remedies which may be proper for enforcing the rights of the beneficiary. It is not necessary that such transferee or purchaser should be guilty of positive fraud, or should actually intend a violation of the trust obligation. It is sufficient that he acquires property upon which a trust is in fact impressed, and that he is not a bona fide purchaser for a valuable consideration and without notice."

As the money so substituted and so impressed with a trust in favor of the beneficial owner was transmitted by such owner in ignorance of its rights and of the facts conferring those rights and without any fault or laches on its part, and its mistake in so transmitting or forwarding the money or fund was induced by the criminal conduct and action and negligence of the party whose successor in interest is now seeking unconscionably to take advantage of it, equity will afford relief, even though the mistake was on one side only and not a mutual mistake. The rule is thus stated:

"Where relief is given because of the mistake of one party alone, it is where it is induced by the conduct of the other party, or because the other seeks unconscionably to take advantage of it, and the ground of jurisdiction is really fraud." 16 Cyc. 68–69.

The principle is illustrated in Martin v. Home Bank, 160 N. Y. 190, 196, 54 N. E. 717. There the plaintiff's testator paid the defendant bank the amount of a check of a third party drawn on another party, and indorsed by him, and which had been credited to his account by the bank with which it was left for collection. The check was not in fact collected, but the failure so to do was due to the negligence of the bank. In ignorance of the facts, plaintiff paid to the bank the amount of the check, but, on learning the truth, his executors, he having died, sued to recover the amount so paid as paid under a mistake of fact. The Court of Appeals, among other things, said:

"When the indorser paid the check without knowledge of the facts, the defendant received so much money from him to which it was not legally entitled. The plaintiff's testator, having paid the check without knowledge of the facts which discharged him from all liability as indorser, was entitled to call upon the defendant to restore the money so paid."

True, in that case the legal title to the money paid the bank was in the plaintiff's testator, who paid it, while here the legal title, perhaps, was in the assignee to whom it was paid, and the equitable title only was in the Syracuse Bank. But the principle involved is precisely the same, viz., the Syracuse Bank, in ignorance of its equitable title and right to retain the money as its own, which ignorance was induced by the wrongful conduct of the other party, and without fault or laches on its part, forwarded the money, which in equity belonged to it, to the Central Bank, which bank in equity had no right to receive or retain it. That bank has at least the equitable right to call upon the one now holding it to return the money. As this court has ample equity

powers in the premises, and has full control of the fund, it is its duty to direct its return to the beneficial or equitable owner. National Bank v. Insurance Co., 104 U. S. 54, 69, 26 L. Ed. 693; A. S. R. Co. v. Fancher, 145 N. Y. 552, 559, 40 N. E. 206, 27 L. R. A. 757; People v. City Bank of Rochester, 96 N. Y. 32. When a bank receives a draft for collection bearing the indorsement of another, and, on receiving notice from its agent he has received the drawee's check for the amount, credits the account of the one leaving the draft with the amount thereof, this shows an irrevocable election and intention to treat the draft as paid. Kirkham v. Bank of America, 165 N. Y. 132, 58 N. E. 753, 80 Am. St. Rep. 714. See, also, Clark v. Merchants' Bank, 2 N. Y. 380. Here it is a question of intention whether or not Northrup and Hill elected or intended to treat the money belonging to them (the Central Bank of Oneida) as the property of the Syracuse Bank in place of the money of that bank converted by it. On the whole evidence in the case that question of fact must be decided in favor of the Syracuse Bank. The Syracuse Bank offered to show by Hill a reason why the amount was not credited to Syracuse on the account the Central Bank kept of these transactions. The trustee objected to this being shown, and the special master sustained the objection. He cannot now complain that there was not a purpose to still further consummate the substitution of the money with the Syracuse Bank in place of the converted fund by entering the transaction on the books. Such an entry would have been conclusive evidence of the intent, but its omission is not fatal to the claim of the petitioner. Again, when the schedules in bankruptcy were made, this substitution was recognized, as the Syracuse Bank was not made a creditor for the amount of the drafts, and the drafts or their proceeds were not included as assets of the Central Bank. And to constitute a substitution and restoration it was not necessary that the Syracuse Bank be present or take part in the transaction. Its subsequent ratification is shown by its demand for the drafts or their proceeds on learning the facts. It is settled that the substitute for the thing converted still follows the nature of the thing itself so long as it can be ascertained to be such substitute. Taylor v. Plumer, 3 M. & Sel. 562, cited and approved in Newton v. Porter, 69 N. Y. 138, 25 Am. Rep. 152; National Bank v. Insurance Co., 104 U. S. 54, 69, 26 L. Ed. 693. In Taylor v. Plumer, supra, Lord Ellenborough said:

"It makes no difference, in reason or law, into what other form different from the original the change may have been made, whether it be into that of promissory notes for the security of money produced on the sale of the goods of the principal as in Scott v. Surman, Willes, 400, or into other merchandise, as in Whitecomb v. Jacob, Salk. 160, for the product or substitute for the original thing still follows the nature of the thing itself so long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fails."

In Newton v. Porter, 69 N. Y. 138, 139, the court, after quoting the above, said:

"In courts of equity the doctrine is well settled and is uniformly applied that when a person, standing in a fiduciary relation, misapplies or converts a trust fund into another species of property, the beneficiary will be entitled to the property thus acquired. The jurisdiction exercised for the pro-

tection of a party defrauded by the misappropriation of property, in violation of a duty, owing by the party making the misappropriation, is exceedingly broad and comprehensive. The doctrine is illustrated and applied most frequently in cases of trusts, where trust moneys have been, by the fraud or violation of duty of the trustee, diverted from the purposes of the trust and converted into other property. In such case a court of equity will follow the trust fund into the property into which it has been converted, and appropriate it for the indemnity of the beneficiary. It is immaterial in what way the change has been made, whether money has been laid out in land, or land has been turned into money, or how the legal title to the converted property may be placed. Equity only stops the pursuit when the means of ascertainment fails, or the rights of bona fide purchasers for value, without notice of the trust, have intervened. The relief will be moulded and adapted to the circumstances of the case, so as to protect the interests and rights of the true owner. Lane v. Dighton, Ambler, 409; Mansell v. Mansell, 2 P. Wms. 679; Lench v. Lench, 10 Ves. 511; Lewis v. Madocks, 17 Ves. 56; Perry on Trusts, § 829; Story's Eq. § 1258."

In National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, the Supreme Court approved the language of Strong, J., in F. & M. Nat. Bank v. King, 57 Pa. 202, 98 Am. Dec. 215:

"It is undeniable that equity will follow a fund through any number of transmutations and preserve it for the owner so long as it can be identified. And it does not matter in whose name the legal right stands. If money has been converted by a trustee or agent into a chose in action, the legal right to it may have been changed, but equity regards the beneficial ownership."

In A. S. R. Co. v. Fancher, 145 N. Y. 552, 559, 40 N. E. 206, 208 (27 L. R. A. 757), the court said:

"The court in many cases resorts to the fiction of a trust, and, by construction, adjudges that the proceeds in the hands of the wrongdoer are held by him as trustee of the plaintiff."

In Matter of Holmes, 37 App. Div. (N. Y.) 15, 55 N. Y. Supp. 708, affirmed 159 N. Y. 532, 53 N. E. 1126, it was held:

"Proof that a trustee, upon his appointment, received a trust fund amounting to $9,364, and paid interest on that sum to the beneficiary up to the time of his death, sufficiently establishes, as against his administrators, that the entire trust fund was in the possession of the trustee at the time of his death, although it appears that $4,650.56 thereof was commingled with individual funds of such trustee. In making withdrawals from the fund, after such commingling of the trust money therein, the trustee is presumed to have used only his individual moneys."

It would be extremely and ridiculously technical to assert that where a wrongdoer, so far as he can, rights a wrong committed in converting the money of another, by substituting at a subsequent time other money of his own to make good that converted, the beneficial owner may not claim and hold the substituted money or property as impressed with precisely the same trust as the original fund. And equity would be short-sighted and hampered, indeed, should it refuse to recognize and enforce the trust character of the thing substituted and the trust obligation thus imposed and created by the owner of the substituted property. It does not lie with the wrongdoer, or his assignee or trustee in bankruptcy, who has made the substitution, to say that the substituted thing is neither the trust property itself nor its proceeds, nor property purchased with the proceeds. Having made the substitution, he should be and is estopped to deny the title of the

owner of the original fund. The assignee of the Central Bank took no better or greater right and title in the fund represented by the drafts than that bank had and it could have been recovered of him. American Sugar Refining Co. v. Fancher, 145 N. Y. 552, 40 N. E. 206, 27 L. R. A. 757; Von Sachs v. Kretz, 72 N. Y. 548. It is now well settled that the trustee in bankruptcy takes the property of the bankrupt in the same plight and condition as when in the hands of the bankrupt and subject to all the valid liens and equities existing in favor of third persons. Thompson v. Fairbanks, 196 U. S. 526, 25 Sup. Ct. 306, 49 L. Ed. 577.

One other fact should be referred to. When the Syracuse Bank learned of the assignment, it at once directed the delivery of all paper held for collection for it to another bank. The correspondence shows that the Syracuse Bank supposed the Paul draft was still held for collection, and that the assignee did not promptly undeceive it, and hence its inability to stop payment of the drafts.

The findings and conclusions of the special master are disapproved and set aside, and there will be an order containing findings of fact and conclusions of law in conformity with this opinion, and adjudging and directing the payment by the trustee in bankruptcy of Walter E. Northrup and Robert A. Hill, as copartners under the name of the Central Bank, to the First National Bank of Syracuse of the sum of $796.23, the proceeds of the two drafts in question. He will also pay the charges of the special master, including stenographer's charges, or so much thereof as he has not already paid, and, if the Syracuse Bank has paid any part thereof, it will be reimbursed by the said trustee.