## SKIRVIN OPERATING CO. v. SOUTHWESTERN ELECTRIC CO.

No. 8678—Opinion Filed Sept. 3, 1918.

(174 Pac. 1069.)

(Syllabus.)

**Corporations—Insolvency—Merger — Liability to Creditors.**

Where an insolvent corporation is absorbed by and merged into another, and where, in fraud of certain of its creditors, all of its assets are taken over and absorbed by the new corporation, and the business of the insolvent corporation is continued at the same place, with the same property, and by substantially the same officers, and where no provision is made respecting the liabilities of the insolvent corporation, so merged and absorbed by the new corporation, the new corporation will, as a general rule, be answerable for all the liabilities of the corporation thus merged and absorbed.

Error from District Court, Oklahoma County; W. C. Crow, Judge.

Action by the Southwestern Electric Company against the Skirvin Operating Company and others. Judgment for plaintiff, and the named defendant brings error. Affirmed.

Warren K. Snyder, for plaintiff in error.

Twyford & Smith, for defendant in error.

TISINGER, J. On August 5, 1913, the Southwestern Electric Company, a special copartnership, obtained a judgment in the county court of Oklahoma county, Okla., against W. B. Skirvin, the Skirvin Investment Company, a corporation, and the Skirvin Hotel Company, a corporation. After fruitless effort to collect its judgment, the Southwestern Electric Company, as plaintiff, on June 1, 1914, began this action in the district court of Oklahoma county, Okla., against the Skirvin Operating Company, a corporation, the Skirvin Investment Company, a corporation, and the Skirvin Hotel Company, a corporation, as defendants, wherein it seeks to recover from the Skirvin Operating Company, the amount of its judgment against W. B. Skirvin, the Skirvin Investment Company, and the Skirvin Hotel Company, obtained in the county court.

Plaintiff based its right of recovery against the defendant the Skirvin Operating Company on the grounds that the Skirvin Operating Company was organized for the purpose of taking over and merging in it all the assets, good will, and business of the Skirvin Hotel Company, with the intent and for the purpose of defrauding plaintiff as a judgment creditor of the Skirvin Hotel Company, which at the time of the merger was insolvent; that the Skirvin Operating Company was a mere continuation of the Skirvin Hotel Company, and that the transaction by which the Skirvin Operating Company took over the assets, good will, and business of the Skirvin Hotel Company was fraudulent, and was done for the purpose of defrauding the creditors of the Skirvin Hotel Company, including the plaintiff.

The answer of the defendant the Skirvin Operating Company denied generally the allegations in plaintiff's petition, and alleged that it acquired the personal property of the Skirvin Hotel Company by virtue of the sale thereof under the foreclosure of a chattel mortgage to the Skirvin Investment Company; that one E. Z. Wallower became the purchaser of said personal property at said sale, who thereafter sold and conveyed the same to the defendant the Skirvin Operating Company. The facts in the case as developed by the evidence are as follows:

On June 16, 1911, the Skirvin Investment Company, a corporation, leased to Fred W. Scherubel, the building situated at the northeast corner of Broadway and First streets, in Oklahoma City, Okla., known as the Skirvin Hotel, for a period of 15 years. Under the terms of the lease the lessor was to pay an agreed rental on the 1st day of every month in advance, and the lessee agreed that he would place and install in the leased premises furniture, fixtures, and appliances, to be fully paid for and unincumbered, of the actual cost to the lessee of the sum of $75,000, upon which furniture, fixtures and appliances, and the replacements thereof and substitutions therefor, the lessor was given a first and prior lien for its rents, which might be foreclosed in the manner prescribed by the laws of Oklahoma for the enforcement and foreclosure of the lien of a chattel mortgage. It was also provided in the lease contract that the lessee might sublet the leased premises to a corporation to be organized under the laws of the state of Oklahoma and known as the Skirvin Hotel Company, which should succeed to all the rights of the lessee under the lease, and be bound by its terms.

On July 20, 1911, the Skirvin Hotel Company was incorporated by Fred W. Scherubel, W. B. Skirvin, and E. Z. Wallower, for the purpose of conducting in Oklahoma City a hotel business, and Fred W. Scherubel was made manager of the Skirvin Hotel. It seems that the Skirvin Hotel Company became involved in financial difficulties, and in April, 1913, the manager of the hotel, Fred W. Scherubel, who was also the original lessee of the hotel building and one of the directors of the Skirvin Hotel Company, committed suicide. The lease contract between the Skirvin Investment Company and Fred W. Scherubel was filed as a chattel mortgage, and default having been made in the payment of rents due to the Skirvin Investment Company by the Skirvin Hotel Company, which according to the terms of the contract succeeded to all the rights and liabilities of Scherubel, the original lessee, the Skirvin Investment Company, as mortgagee, on the 26th day of July, 1913, posted in Oklahoma county notices of sale of all the furniture, fixtures, and appliances, the replacement thereof, and substitutions therefor said sale to be had on the 6th day of August, 1913, in order to collect the past-due and unpaid rent in accordance with the terms of the contract. On said 6th day of August, 1913, the property described was sold to E. Z. Wallower for the sum of $15,000.

On said 6th day of August, 1913, a corporation known as the Hotel Operating Company was incorporated, and its articles of incorporation filed with the secretary of state of Oklahoma. C. L. Webb, J. Robbins, and I. M. Canfield were named as directors of this corporation, and the purpose for which it was formed was to conduct and operate hotels. These articles of incorporation were amended on August 12, 1913, in the following respects: The name of the corporation was changed from the Hotel Operating Company to the Skirvin Operating Company, and the names of its directors from C. L. Webb, J. Robbins, and I. M. Camfield to W. R. Skirvin, C. J. Skirvin, and E. Z. Wallower.

On August 6, 1913, E. Z. Wallower made a bill of sale to the Hotel Operating Company of all the furniture, fixtures, and appliances in the Skirvin Hotel which had been purchased by him on that same day at the sale under the foreclosure of the chattel mortgage in favor of the Skirvin Investment Company against the Skirvin Hotel Company. No consideration is recited in this bill of sale, but on the same day the said

E. Z. Wallower made in writing to the Hotel Operating Company a proposition that he would execute to it such a bill of sale, provided the Hotel Operating Company would issue to him, or to any persons whom he might designate, shares of stock in the company of the par value of $20,000. This proposition was on the same day accepted by the directors of the Hotel Operating Company, and the shares of stock were accordingly directed to be issued to him, or to whomsoever he might designate. At this same meeting J. Robbins, I. M. Camfield, and C. L. Webb tendered their resignations as directors and officers of the Hotel Operating Company, and C. J. Skirvin, W. B. Skirvin, and E. Z. Wallower were elected as directors in their stead, and W. B. Skirvin was elected president and manager of the corporation, E. Z. Wallower, vice-president, and C. J. Skirvin, secretary. At the same meeting the president of the company stated that he had caused to be prepared amended articles of incorporation for the purpose of changing the name of the company from the Hotel Operating Company to the Skirvin Operating Company, which amendment appears to have been prepared on the same day and filed with the Secretary of State August 12, 1913, and is hereinbefore referred to.

It appears that these three corporations had interlocking directorates. W. B. Skirvin was president of the Skirvin Investment Company. He was also a director and officer of the Skirvin Hotel Company, and was a director and president of the Skirvin Operating Company. E. Z. Wallower was also a director and vice-president of the last-named company and a director of the Skirvin Hotel Company. The directors and officers of the Skirvin Hotel Company and the Skirvin Operating Company were the same with the exception of Fred W. Scherubel, who died in April before the Hotel Operating Company was organized in August. It further appears that the only tangible assets of the Skirvin Hotel Company were the furniture, fixtures, and appliances in the Skirvin Hotel, upon which the Skirvin Investment Company held its lien for rent. It also appears that at the time of the sale of the assets of the Skirvin Hotel Company under the foreclosure of the chattel mortgage held by the Skirvin Investment Company the Hotel Company was in debt about $50,000, including its indebtedness for rent, and its circumstances were such that it either had to close up, be reorganized, or sold out.

When the property was sold under the chattel mortgage, E. Z. Wallower bought it

for $15.000. The property at that time was worth something like $65,000, if the hotel business had been a prosperous one, and it appears that the property bought by Wallower was all of the property of the Skirvin Hotel Company, which according to the terms of the lease cost originally not less than $75,000. A proposition was made to Wallower by W. B. Skirvin, president of the Skirvin Investment Company, that if he would buy the property at the sale and furnish money to operate the hotel with, the stockholders of the Skirvin Investment Company would take stock in the new organization, the Skirvin Operating Company, for the rent that was due the Skirvin Investment Company. It appears that this proposition was accepted, and $5,000 of the $20,000 worth of stock in the new corporation was issued to E. Z. Wallower, and the $15,000 worth remaining was issued to the persons designated by Wallower in accordance with the proposition made to him by W. B. Skirvin, and the proposition made by him to the Hotel Operating Company on August 6th, and accepted by it on the same day. It also appears that Wallower purchased $10,000 worth of stock of the Skirvin Operating Company, in addition to the stock already issued to him, paying for it in cash, and this sum was used by the Skirvin Operating Company with which to operate the hotel.

It further appears that afterwards, in two suits filed in the district court of Oklahoma county, Okla., wherein the Skirvin Hotel Company, the Skirvin Investment Company and the Skirvin Operating Company, and W. B. Skirvin, C. J. Skirvin, and E. Z. Wallower were defendants, a decree was agreed on by all the parties in the two cases, consolidated, wherein it is recited that all the parties to the two cases had presented to the court a proposed plan for the reorganization of the Skirvin Hotel Company, and for the adjustment and settlement of the rights of all parties to said case, as follows:

"(1) That of the $50,000 authorized capital stock of the Skirvin Operating Company, a corporation, $15 000 par value be apportioned to the nominees of the Skirvin Investment Company from Skirvin Hotel Company.

"(2) That of said $50,000 authorized capital stock $10,000 be apportioned to E. Z. Wallower in consideration of $10,000 in money heretofore paid into Skirvin Operating Company by the said E. Z. Wallower, a portion of which was used in the payment of the debts of the Skirvin Hotel Company, and the remainder of which was used to carry on the business of the Skirvin Operating Company after its organization.

"(3) That of the remaining $25,000 authorized capital stock of the said Skirvin Operating Company, there shall be issued to the creditors of the Skirvin Hotel Company stock of the par value following:

| Name. | Amount. |
| --- | --- |
| E. Z. Wallower, for other money loaned | $3,300.00 |
| State National Bank, amount due on note | 1,000.00 |
| R. D. Rumsey, loan | 400.00 |
| O. S. Picher, loan | 1,000.00 |
| Mrs. D. J. Heyser, loan | 200.00 |
| Skirvin Investment Company on note | 2,000.00 |
| Total | $8,300.00 |

"Some of the foregoing indebtedness being evidenced by negotiable promissory notes, it is agreed that the above stock shall be issued to the present owners and holders of the notes evidencing such indebtedness, upon the surrender of such notes.

"(4) The remaining $16,700 authorized capital stock of the Skirvin Operating Company shall be issued and distributed pro rata among the holders of the $105,000 stock issued in the Skirvin Hotel Company.

"And the court having considered the aforesaid proposed plan or reorganization, and being well and sufficiently advised in the premises, is of the opinion that the same provides a fair and equitable adjustment and settlement of this litigation and of the rights of all parties concerned, and does hereby adopt the same as the basis of its decrees in the above entitled cause. And it appearing to the court that stock of the Skirvin Operating Company of the par value of $15,000 has already been issued to the nominees of the Skirvin Investment Company in payment of its aforesaid rent claim, which is the amount of stock to which such persons are entitled under the aforesaid reorganization plan, and it further appearing to the court that stock of said Skirvin Operating Company of the par value of $15,000 has already been issued to E. Z. Wallower, which amount is less than the said E. Z. Wallower is entitled to as a creditor and stockholder of the Skirvin Hotel Company as aforesaid, it is therefore by the court ordered, adjudged, and decreed: That the aforesaid stock issues already made by the Skirvin Operating Company to E. Z. Wallower and the nominees of the Skirvin Investment Company be and the same are hereby confirmed, and that the remaining authorized capital stock of the Skirvin Operating Company be issued and delivered as follows, to wit: To E. Z. Wallower $1,800 of said capital stock, in addition to the $15,000 of stock already issued to the said E. Z. Wallower, making the total stock of said E.

Z. Wallover is said corporation $16,800; the same being in payment of the $10,000 mentioned in paragraph numbered 2, of the foregoing reorganization agreement, the $3,300 owing to the said E. Z. Wallower mentioned in paragraph numbered 3 thereof, and the pro rata share of the said E. Z. Wallower as a stockholder of the Skirvin Hotel Company. To the State National Bank, stock of the par value of $1,000. To Joe Rumsey, stock of the par value of $400. To R. D. Rumsey, stock of the par value of $400. To O. S. Picher, stock of the par value of $1,000. To Mrs. D. J. Heyser, stock of the par value of $200. To C. J. Skirvin, the present holder of the note to the Skirvin Investment Company, mentioned in paragraph numbered 3. stock of the par value of $2,000: Providing, however, that if the notes evidencing any of the foregoing indebtedness are now held by others than the persons above named, then such stock shall be issued to the present owners thereof. To the holders of the remainder of said $105 000 of stock issued in the Skirvin Hotel Company there shall be distributed and issued pro rata the remaining $16,700 par value of stock of the Skirvin Operating Company.

"It is further ordered that the aforesaid stock shall be issued to the persons entitled thereto under the terms of the foregoing agreement and of this decree, upon the surrender to Skirvin Operating Company for cancellation of the stock of the Skirvin Hotel Company and of the promissory notes in payment of which the same is to be issued hereunder. It is further ordered, adjudged, and decreed that all other, further, or different relief demanded by the plaintiffs. or either of them, or by either of the interveners be and the same is hereby denied, and all claims of defendants in, to. or against Skirvin Hotel Company are decreed to be merged in this decree. And it is ordered, adjudged, and decreed that the costs of this suit be paid by the Skirvin Operating Company; the purpose and intent of this requirement as to costs being that the same shall be equitably shared by the parties to this litigation.

"The clerk of this court is ordered to enter this decree in each of the causes aforesaid."

It is apparent from an examination of this decree, taken in connection with the evidence of W. B. Skirvin, that the decree attempts to carry out the plan of the stockholders of the Hotel Operating Company and the Skirvin Operating Company at the meeting of their stockholders and directors on August 6, 1913. By the terms of this decree $10,000 worth of stock of the Skirvin Operating Company was apportioned to E. Z. Wallower in consideration of $10.000 in money which he had previously paid into the company;

$15,000 worth of stock of the Skirvin Operating Company had already been issued through him to the nominees of the Skirvin Investment Company in payment of its claim for rent against the Skirvin Hotel Company; and $8,300 worth of stock of the Skirvin Operating Company was apportioned and ordered issued to E. Z. Wallower and other creditors of the Skirvin Hotel Company. The remainder, after satisfying all these creditors, was to be issued to the stockholders of the Skirvin Hotel Company in proportion to the amount of stock held by each. It will be observed that the stock in the new company was to be issued, under the agreed decree, to stockholders of the Skirvin Hotel Company only upon surrender to the Skirvin Operating Company for cancellation of all the stock of the Skirvin Hotel Company held by them and upon surrender for cancellation of promissory notes held by creditors of the Skirvin Hotel Company in order that they might be canceled. It will also be observed that no provision is made by the stockholders and directors of either company at their meeting on August 6, 1913, or by the agreed judgment and decree in the two cases consolidated, in the district court of Oklahoma county, Okla., dated January 12, 1914, for the payment of the claim of the plaintiff in this case, and that its judgment remains an unsatisfied liquidated demand against the Skirvin Hotel Company.

From a careful reading of the record in this case we arrive at the following conclusions: (1) That the Skirvin Operating Company was promoted, incorporated, and controlled by substantially the same stockholders and officers as the Skirvin Hotel Company. (2) That the Skirvin Operating Company came into possession of the entire assets and business of the Skirvin Hotel Company without paying any adequate consideration therefor. (3) That the Skirvin Operating Company is in law and in point of fact merely a reincarnation of the Skirvin Hotel Company. (4) That the transfer of the assets of the Skirvin Hotel Company to the Skirvin Operating Company was merely a merger in fact, although the corporate existence of the Skirvin Hotel Company might continue, and that the new corporation was created merely for a continuation of the business of the original one. It appears that the Skirvin Hotel Company engaged in a business which proved to be unprofitable. It owned property of the value of $65,000 or $75 000 and this property was by a scheme of legal legerdemain transferred to another

corporation, to wit, the Skirvin Operating Company, composed substantially of the same persons, which transacted the same business, at the same place, and with the same property. The consideration paid to the stockholders of the corporation which held and foreclosed the chattel mortgage for the personal property sold under the foreclosure was stock in the new company at par value. Certain creditors of the old company were also paid by the new company with stock of the new company at par value, and the remainder of the stock of the new company was then distributed to the stockholders of the old company in proportion to the amount of their several holdings. By thus taking all the property and business of the old corporation, the new corporation left the other only its corporate shell.

We are of the opinion that such a transaction was unconscionable; that it was in effect an effort to defraud the creditors of the old corporation, or that would operate as a fraud against such creditors; that the new corporation is a mere continuation of the old one, under a slightly different name; and that a creditor of the old corporation may look to the new one for payment of its claim. We are supported in these conclusions by the ablest writers of our text-books and by decisions of our higher courts. The rule is thus stated in Thompson on Corporations (2d Ed.) § 6082:

"Succeeding corporations are not infrequently held liable where there may not be strictly a consolidation. Generally, if a new corporation is organized by the stockholders of an old concern and receives the property of the old, the creditors of the old corporation may proceed directly against the new. This rule is applied especially where such arrangement and the transfer of the property is made for the purpose of defrauding the creditors of the old company. Thus a corporation composed of substantially the same stockholders, receiving without consideration all the property, including a certain contract for the sale of goods, for the purpose and with the intent of defrauding the creditors of such former company, was held liable on a contract of the old company entered into before the transfer of the property. Where the consolidation results in terminating the existence of the constituent companies, and there is no agreement as to liabilities, the consolidated corporation will generally be entitled to all the property and will be answerable for all the liabilities of the old corporation. And if the successor is technically a new corporation, and the old has actually ceased to exist, and all its assets and franchises have passed to the new, and it is a mere continuation of the old, the

liability continues. Neither law nor equity will permit one corporation to take all the property of another, deprive it of the means of paying its debts, enable it to dissolve its corporate existence, and place itself practically beyond the reach of creditors, without assuming its liabilities. In order to render a consolidated corporation liable for the debts of a constituent company it is necessary to show an agreement to pay such debts, or prove a consolidation, or show that the purchasing corporation was a mere continuation of the selling corporation, or that the transaction was fraudulent in fact."

Also, the same author, at section 6086, says:

"The mere change of name will not affect either the identity or the liability of a corporation. Thus members of an insolvent corporation may reorganize for the purpose of carrying on the business of the old corporation, where they act with a bona fide intention of creating a new corporation; but they cannot by such a new organization, or by a mere change in the name of the corporation, affect the legal status or rights of creditors. So, where the consolidation was under a new name, it was held that it could be sued in such name for debts of the old companies."

See, also, Ruling Case Law, title "Corporations," vol. 7, § § 155, 156.

A long line of decisions may be found wherein it is held that when a corporation is merged into or absorbed by another, which continues its business, and where there is no substantial change of ownership, nor in the kind of business carried on, then the new corporation is but the successor of the former concern, and is liable as such for its debts. Austin v. Tecumseh National Bank, 49 Neb. 412, 68 N. W. 628, 35 L. R. A. 444, 59 Am. St. Rep. 543; Grenell v. Detroit Gas Co., 112 Mich. 70. 70 N. W. 413; Berthold v. Holladay-Klotz Land & Lumber Co., 91 Mo. App. 233; Friedenwald Co. v. Asheville Tobacco Works, 117 N. C. 544, 23 S. E. 490; Atlantic & Birmingham Ry. Co. v. Johnson, 127 Ga. 392, 56 S. E. 482, 11 L. R. A. (N. S.) 1119. In Montgomery Web Co. v. Dienelt, 133 Pa. 585, 19 Atl. 428, 19 Am. St. Rep. 663, it was held that, where a new corporation was formed by the stockholders and creditors of the old, stock in the new corporation being issued in lieu of that of the old corporation, and practically all of the assets of the old corporation were transferred to the new in consideration of the assumption of certain debts, such transfer was fraudulent as to a creditor whose claim was not provided for. The court said:

"As already said, a majority of the stock-

holders in the new company are simply the stockholders of the old company holding as such, and without other consideration. As to these, it has been a mere change of name. As to the other or new stockholders, it appears from the agreed facts that they were creditors of the old company, and hold their present stock solely in consideration of their former claims as creditors. They paid nothing else for it; and they must have known that the new corporation into which they entered in this way was not a new enterprise, in the regular course of business, under the incorporation act of 1874, as it professed to be, but a new turn in the old enterprise, all of whose property was being practically handed over, not to them alone in payment, which they might, perhaps, rightfully have accepted, but to them in conjunction with their late debtors. Under such circumstances, they were bound to take notice of the nature of the transaction, and to know that equity would still regard the property as a trust for the payment of existing debts, and would follow it on behalf of creditors until it should get into the hands of innocent purchasers for value. Such purchasers they were not. The old stockholders were not purchasers for value at all; and the new stockholders were not innocent, for they knew, or were bound to take notice, of the taint in their coadventurers' title."

In Altoona v. Richardson Gas & Oil Co., 81 Kan. 717, 106 Pac. 1025, 26 L. R. A. (N. S.) 651, the court, in holding a succeeding gas company liable to the city for the fees due it from the franchised company, based its decision upon the general ground that where one corporation becomes practically extinct, transferring all its assets to another and receiving in return stock in the other corporation which succeeds to its business, the new corporation is liable to the extent of the old one. The court in this case said:

"Such an arrangement is essentially a merger, and should be attended with the same consequences as a consolidation."

In Friedenwald v. Asheville Tobacco Works, 117 N. C. 544, 23 S. E. 490, it was held that, where a new corporation was organized by the officers and stockholders of the old corporation for the purpose of enlarging the business, the shareholders of the old corporation receiving stock in the new, the law would imply a stipulation on the part of the new to pay the debts of the old concern. In Hibernia Insurance Co. v. St. L. & N. O. Transp. Co., 4 McCrary, 432, 13 Fed. 516, it was held that where all the property of one corporation was transferred to another, composed substantially of the same persons to transact the same business at the same place, and with the same property, the

consideration to be stock in the new corporation and the assumption of certain debts, the new corporation might be held accountable to creditors of its predecessor.

In Blair v. S. L ., H. & R. R. Co. (C. C.) 22 Fed. 36, and 24 Fed. 148, it was held that the transfer of the assets of one corporation to another, whereby, through a mere change of name, an attempt is made to defraud creditors, or which would operate as a fraud, cannot be upheld as against creditors. In Central of Ga. Ry. Co. v. Paul, 93 Fed. 878, 35 C. C. A. 639, the court says:

"Where a plan for reorganization is entered into by the stockholders and secured creditors of an insolvent corporation, and is carried out, pursuant to which all the property of the corporation is sold by foreclosure and otherwise, and transferred to the new corporation, whereby the stockholders of the old corporation retain their interests and rights, and by virtue thereof are either stockholders in the new corporation or are otherwise provided for this is a fraud on an unsecured creditor of the old corporation, so that she may hold the new corporation for her claim."

In this case the assets of the corporation, which were taken over by the defendant the Skirvin Operating Company, so far exceed in value the amount of plaintiff's judgment against the defendant that we do not consider it necessary to discuss the question as to whether or not plaintiff was only entitled to the enforcement of an equitable lien against the property so taken over and acquired. The value of the property acquired is many times the amount of plaintiff's judgment. The trial court rendered judgment in favor of the plaintiff against the defendant for the full amount of its judgment obtained in the county court against the Skirvin Hotel Company.

We think that the judgment of the trial court was supported by the evidence, and is authorized by law, and the judgment is therefore affirmed.