Frank Knass and Dina Knass, Appellees, v. Madison & Kedzie State Bank and Madison-Kedzie Trust & Savings Bank, Appellants.

Gen. No. 36,033.

Opinion filed March 6, 1933.

SIMS, STRANSKY, BREWER & POUST and WINSTON, STRAWN & SHAW, for appellants; FRANKLIN J. STRANSKY, OTTO W. BERG, HAROLD BEACOM and HAROLD A. SMITH, of counsel.

SHULMAN, SHULMAN & ABRAMS, for appellees.

MR. JUSTICE MATCHETT delivered the opinion of the court.

This case is now before this court on rehearing granted. The appeal is by the Madison & Kedzie State Bank and the Madison-Kedzie Trust & Savings Bank, both banking corporations, from a decree in equity, by which both were held liable for a balance due upon an accounting between complainants and the Madison & Kedzie State Bank. The decree after granting equitable relief as prayed entered judgment against both banks and Will H. Wade, receiver of one of them, for $17,265.25, with interest. The cause was heard upon exceptions to a master's report. Exceptions of complainants were sustained, those of defendants overruled, and the decree entered accordingly.

The Madison & Kedzie State Bank was a corporation under the laws of Illinois engaged in the business of banking in Chicago prior to February 10, 1930. The Madison-Kedzie Trust & Savings Bank is an Illinois corporation which on February 10, 1930, under circumstances hereafter discussed, took over the banking business of the Madison & Kedzie State Bank and continued to carry on the same on the same premises. We shall hereafter in this opinion refer to the State Bank as the ''old'' bank and to the Trust & Savings Bank as the ''new'' bank.

The facts with reference to the controversy appear to be that on or about August 1, 1928, complainants (husband and wife) were customers of the ''old'' bank and upon solicitation by its representatives at different times purchased from it certain real estate ''gold bonds'' so-called. It was represented to complainants that the real estate securing these bonds was of a value of twice the face value of the bonds, and the preponderance of the evidence shows that it was agreed upon the part of the ''old'' bank in substance that it would repurchase these bonds at any time after one year from the sale at par less one per cent, plus accrued interest, and at the end of three and a half years at par.

The first transaction was on August 1, 1928, when complainants purchased $6,000 par value of these bonds, paying par and accrued interest therefor. A statement of the transaction made by the "old" bank has an indorsement thereon as to the agreement of the "old" bank to repurchase on these terms. Thereafter similar purchases were made and similar indorsements were included in the contracts. The agreement was made on behalf of the "old" bank by Mr. Gleason who was then its vice president. The purchase by complainants of these bonds upon such conditions aggregated a total of $100,000,—$60,000 of which in conformity with its agreement were repurchased by the "old" bank, leaving in the hands of complainants, bonds of the par value of $37,100 together with accrued interest.

Complainant, Frank Knass, put up $25,000 par value of these bonds as collateral to a note given by him to secure a loan to the "old" bank. After the business passed into the hands of the "new" bank, as hereafter described, the note was renewed by the "new" bank for the sum of $22,463.10. The note was dated May 10, 1930, was due June 9, 1930, and drew interest at the rate of 7 per cent per annum. Payments were from time to time made on this note leaving a balance due thereon of $22,189.14.

The decree describes in detail the bonds deposited as security to this note and the bonds which complainants purchased and finds that the appraisals of the property as made for the purpose of selling these bonds were false; that the "old" bank received large sums as commission out of the transactions, and that all of the bonds were about to default in interest at the time of sales; that this information was kept secret from complainants; that complainants relied on the false representations of the "old" bank in these respects and were damaged and defrauded thereby; that demands were made on both the "old" and the "new"

banks to pay the bonds and cancel the indebtedness and the note, which requests were refused by both of them; that the ''new'' bank knew of the agreement between complainants and the ''old'' bank and had full knowledge of the conditions upon which the sales were made and the notes given.

The decree further found that upon tender of the bonds it was the duty of each of the banks to carry out the agreement made by the ''old'' bank and that the ''new'' bank by taking over the assets of the ''old'' bank became liable. The decree therefore directed ''that the collateral note above described and set forth, be and is hereby declared cancelled, and said 'new' bank is hereby directed to surrender said note to the complainants, and that the said banks credit themselves with the sum of $22,189.14, which is deducted from the amount due to complainants in the sum of $39,454.39, and that complainants have and recover from Madison & Kedzie State Bank and Will H. Wade, its receiver, and Madison-Kedzie Trust and Savings Bank, the sum of $17,265.25, plus interest thereon at the legal rate from the date of said master's report, and that an execution be issued against them in favor of the complainants for said amount.''

The ''new'' bank took over the property of the ''old'' bank pursuant to the terms of a written agreement made February 8, 1930, and executed in behalf of each of the banks by their respective presidents. The agreement is attested by P. A. Schroeder, cashier, who seems to have acted in that capacity for the ''old'' and the ''new'' banks.

The agreement in substance recites that unfavorable conditions then existed in respect to real estate which made loans dependent upon real estate equities and direct loans upon real estate non-liquid and difficult to collect; that among the resources of the ''old'' bank was a substantial amount of such loans and other loans

considered bad and doubtful, which assets were of such objectionable character that although there might be a considerable ultimate salvage from them, the Chicago Clearing House Association had passed a resolution requiring that assets of such character to the extent of at least $3,000,000 be entirely eliminated from the resources of the bank; that if this were done without substituting other assets of sound value and liquid, it would result in a substantial impairment of the capital investment of the "old" bank; that the deposits of the "old" bank had been reduced during the 30 days immediately preceding the date of this agreement to the extent of approximately $2,700,000; that presumably the depositors of the "old" bank felt their deposits were in jeopardy, and that it was deemed by the directors and shareholders of the "old" bank, owning or representing a substantial portion of its capital stock, that it would be to the best interests of "all the creditors and all of the shareholders of the Old Bank"; that the "new" bank as organized should assume certain specific liabilities thereinafter identified "and none other" and take over the assets of the "old" bank as shown on its books and liquidate them in an orderly manner and use the proceeds, first, to the payment of liabilities assumed, with interest, returning any surplus assets, after the payment of all such liabilities with interest to the "old" bank; that it was deemed advisable that action should be taken without delay; that it was not expedient to give notice and call or hold a meeting of the shareholders; and the "new" bank having been organized under the laws of Illinois, it was mutually agreed by the parties that the "old" bank covenanted that its resources and liabilities assumed were clearly shown by its books and records as at the close of business on February 8, 1930, and were truly reflected in the balance sheet attached and made a part of the agreement; that the "old" bank sold, conveyed,

transferred, assigned, set over and delivered to the "new" bank "all of its property, assets, business and effects, rights, titles and interests, real and personal of every kind, nature and description and wheresoever situated, and all of its right, title and interest therein, including choses in action (and particularly claims of Federal Income Tax Refunds, if any) and any and all property, rights, titles and interests of every kind, nature and description held in trust by or in the possession of any other person, persons, or corporations whatsoever for the benefit of the Old Bank, or in which said Bank has any right, claims or interests of any kind, directly or indirectly, all as at the close of business on February 8, 1930, to be the absolute property forever of the New Bank, upon the terms and conditions herein contained."

The agreement further provided that the "old" bank should at any time thereafter execute and deliver such instruments as would be legally sufficient and requisite to vest in the "new" bank full and complete, absolute legal and equitable title in and to all of the property, assets and effects sold and transferred thereunder, and, in particular, to deliver to the "new" bank such instruments of assignment and conveyance as would be legally sufficient and requisite to vest in the "new" bank full and complete legal title to all of the bonds and securities theretofore deposited by the "old" bank with the auditor of public accounts of Illinois, pursuant to the provisions of an act to provide for and regulate the administration of trusts by trust companies approved June 15, 1887, and that the auditor should not release these securities to the "new" bank until the "old" bank had fully complied to his satisfaction with all the requirements of that act; and further that the "old" bank would execute and deliver such instruments as would be legally sufficient and requisite to vest in the "new" bank full and complete legal title to

all securities theretofore deposited by the "old" bank with the United States Treasury Department to secure deposits of the Board of Trustees Postal Savings or with any other depositary.

By the fourth paragraph of the agreement the "new" bank assumed and agreed to pay certain specific liabilities of the "old" bank as shown by its books and records at the close of business on February 8, 1930. These liabilities were enumerated, and it was expressly stated that the "new" bank should not be understood to assume or agree to pay any liability or obligation except such as were specifically designated in this paragraph.

By the fifth paragraph the "new" bank undertook and agreed to reimburse itself for the liabilities so assumed out of the assets transferred, it being agreed that all cash on hand and amounts due from banks would be immediately applied as a credit upon the liabilities assumed and that like credit should be from time to time given as cash was realized from other resources transferred.

In this agreement the value of the capital stock of a safety deposit vault company which was transferred from the "old" bank to the "new" bank was fixed at $1 plus the cash surplus as shown by its statement of February 8, 1930, and this amount was to be applied as a credit upon the liabilities assumed. The value of the banking house equity and equipment without deduction for any general real estate taxes accruing after January 1, 1930, including stationery and supplies, was fixed at the sum of $500,000, less the amount of accrued interest on the mortgage on the banking house, and this value, it was agreed, should also be applied as a credit upon the liabilities assumed.

By another provision it was agreed that on or before 90 days from the date thereof the president and a majority of the directors of the "new" bank, or a com-

mittee of three directors selected by a majority of the directors of the new bank, should go through the loans, including real estate bonds and mortgages, transferred to the "new" bank and should list such items as in their judgment should be valued on the liabilities assumed and the face value of all such loans, plus accrued interest, if any, and the face value of all such real estate bonds and mortgages plus accrued interest, if any, less unearned commissions thereon required to be paid and paid by the "new" bank, if any, so listed, should thereupon be applied as a credit on the liabilities assumed; that up to the time that any loan, other asset or item, transferred to the "new" bank thereunder, had been applied as a credit, the net cash proceeds realized by the representing principal, interest or income, should be applied as a credit on the liabilities assumed, with the understanding, however, that after the date on which any such had been credited, all proceeds and avails therefrom, and all interest or income in respect thereof, should be the sole property of the "new" bank and should not be applied as a credit on the liabilities assumed.

By another provision it was agreed that the daily balances of the liabilities assumed, less credits applied thereon, should draw interest at the rate of six per cent per annum; that the "new" bank should pay personal property taxes levied and assessed against the stock of the "old" bank for the years 1928 and 1929, and should pay federal income taxes and property taxes assessed against the assets of the "old" bank as the same should become due and payable, but that this should not be deemed to be an acknowledgment of any assumption of such liabilities by the "new" bank, although the amount so paid should be added to the amount of liabilities assumed and the "new" bank reimbursed therefor out of the assets transferred to it.

It was agreed that the "new" bank should have absolute power, without notice, to sell, surrender, compromise, settle or dispose of any assets transferred to it by the "old" bank, including the right to enter into any agreement, reorganization, consolidation or merger, or to make advances or loans for the purpose of conserving the assets transferred; that the "new" bank should have the right to be reimbursed in full with interest, and that it should have the sole right in its discretion to determine the application of payments and credits.

All diligence in collection, presentment, etc., was waived. The absolute power to determine the legality, validity, etc., of all liabilities assumed was granted the "new" bank with the provision that neither neglect nor omission should create any liability against it.

For the purpose of enabling the "new" bank to conserve, protect, etc., it was given the absolute power to use the name of the "old" bank in all matters, whether in or out of court, and the "old" bank agreed, at the request of the "new," to sign, execute and deliver in the name of the "old" bank any and all instruments deemed by the "new" bank necessary to enable it to conserve, protect, collect, liquidate and dispose of any of the assets. The "new" bank was given the power to employ attorneys, counsel, agents, accountants, auditors or other employees, in connection with the handling of the assets transferred to it, but was released from liability for the action of such employees, except for failure to use good faith in the selection thereof. It was provided that the "new" bank should not be entitled to any compensation or commission for its services in connection with the liquidation of the assets of the "old" bank provided, however, that the "new" bank should be reimbursed out of the assets so transferred, for any out-of-pocket expense or cost it might incur in connection with such services, including

the compensation and charges of any attorneys, counsel, agents, etc. The "new" bank was given the right at any time, in its discretion, to sell, assign, transfer and deliver the whole or any part of the assets transferred to it, in parcels or in bulk, at public or private sale, either with or without notice to the "old" bank.

It was further provided that all the assets of the "old" bank transferred to the "new" should be applied, first, to the payment of the "new" bank of the amount of the liabilities assumed, plus additions, and when these liabilities had been paid in full the "new" bank should turn over to the "old" bank any surplus assets, or the proceeds of any assets, then remaining in its hands. It was expressly provided that the assets conveyed by the "old" bank to the "new" bank should not be deemed to include any contingent liability of the stockholders of the "old" bank to the "old" bank or the creditors of the "old" bank, and that the "new" bank should in no event have the right to avail itself of or to enforce for itself or for any person, firm or corporation any stockholders' or directors' liability against the stockholders and directors of the "old" bank.

The "new" bank took possession of these assets under this agreement, and the note of complainant, which was then past due, was among the assets transferred and delivered. Gleason, who theretofore had acted as vice president and manager of the bond department of the "old" bank and who had sold these securities to complainants, was vice president and director of the "new" bank. Several other officers and directors of the "old" bank also became officers and directors of the "new" bank. Only a few of the stockholders of the "old" bank, however, became stockholders of record in the "new" institution.

It is contended here in behalf of the receiver and of the "old" bank that the interest of complainants was

several, not joint, and that a decree in their favor jointly was therefore unwarranted. These defendants cite *Brady v. Koontz,* 145 Ill. App. 582, and *Moore v. Terhune,* 161 Ill. App. 155, in both of which cases judgments at law were reversed. However, in equity where the matter in litigation has a common origin, as here, the parties having separate interests may be joined. *Regan v. Grady,* 343 Ill. 423. Moreover, the evidence here shows a joint interest of complainants in the litigation. The objection of a misjoinder was not raised by the pleadings nor by objection or exception to the report of the master, and therefore will be regarded as waived. *Crawford v. Schmitz,* 139 Ill. 564; *Bird v. Bird,* 218 Ill. 158; *Devine v. National Safe Deposit Co.,* 240 Ill. 369; *Cunat v. Supreme Tribe of Ben Hur,* 249 Ill. 448; *Bevans v. Murray,* 251 Ill. 603; *McIntyre v. McIntyre,* 287 Ill. 544. It is true, as was held in *Tribune Co. v. Thompson,* 342 Ill. 503, and *Continental Clay Co. v. Illinois Kaolin Co.,* 232 Ill. App. 596, that the pleadings, the proof and the decree must correspond, but these bonds were payable to bearer and were offered and received in evidence by complainants, and while the evidence shows that originally some of them were billed by the ''old'' bank in the name of one complainant and some in the name of the other, we hold that to be immaterial in view of the fact that the bonds were payable to bearer and were offered and received in evidence in support of their joint action which had its origin in similar transactions in which the evidence shows both husband and wife participated.

It is also urged that the right of action was purely legal and that complainants had an adequate and complete remedy. *Brauer v. Laughlin,* 235 Ill. 265, and similar cases are cited. So far as the ''old'' bank was concerned, the proceeding was upon contracts obtained by fraud and misrepresentation, and equity

has concurrent jurisdiction with the law courts of all such actions. *Eggers v. Anderson,* 63 N. J. Eq. 264; *Mahar v. O'Hara,* 4 Gilm. 424; *Youngquist v. Hunter,* 227 Ill. App. 152; *Mayr v. Chesman & Co.,* 195 Ill. App. 587; *Owens v. Union Bank of Chicago,* 260 Ill. App. 595. Moreover, the bill prayed and the decree granted equitable relief in that it enjoined the transfer by defendants of complainants' note. The court therefore had equitable jurisdiction and having such jurisdic-. tion would in accordance with well established rules settle by its decree all questions at issue between the parties.

It is urged that the remedy at law was complete, but that clearly was not the case. Moreover, the rule that equity will not take jurisdiction where there is a remedy at law is a qualified one. It is so held in *Barton v. DeWolf,* 108 Ill. 195, on which defendants rely. That rule is intended for the protection of the courts and is not to be used as a shield by litigants. *Curtis v. LeMoyne,* 248 Ill. App. 99. Then, too, this defense was not set up in the answer and therefore was not available. *Kaufman v. Wiener,* 169 Ill. 596.

It is urged that by reason of the statute, "An act for the Protection of Bank Depositors," approved June 4, 1879, in force July 1, 1879, Cahill's St. ch. 38, ¶ 38 *et seq.* (Smith-Hurd's Ill. Rev. Stats. 1931, ch. 38, sec. 64) the agreements on the part of the "old" bank to repurchase these bonds were illegal and void, and that whether by reason of the statute or otherwise the same were void as being ultra vires the "old" bank. We had supposed this question was settled contrary to the contention of defendants so far as the Appellate Court of this district can settle any question. The question of ultra vires was directly passed upon in *Freedman v. Madison & Kedzie State Bank,* 259 Ill. App. 519. It is true that the act in question was not specifically called to our attention in that case. It

was presented, however, to the Supreme Court for consideration upon the application for certiorari, which was denied. The defense of ultra vires was also held unavailable by the second division of this court in the later case of *Awotin v. Atlas Exchange Nat. Bank*, 265 Ill. App. 238, and in *Madison-Kedzie Trust & Savings Bank v. Dean*, 263 Ill. App. 646, where the same court had under consideration a case in which the "new" bank, defendant here, undertook (claiming as purchaser in due course) to sustain a judgment by confession at law entered upon a note taken by it from the "old" bank under circumstances substantially similar to those which appear here. In the case of *Hoffman v. Sears-Community State Bank*, 269 Ill. App. 644 (Abst.), opinion filed February 6, 1933, the statute in question, as well as a number of cases which it was there insisted had not been called to our attention in these previous cases, received consideration.

This rehearing was not granted for the purpose of reviewing these decisions upon this point. On the contrary, we adhere to the views heretofore expressed. We find it impossible to hold that in a court of equity the "old" bank may be heard to repudiate its contract as ultra vires or against public policy and at the same time keep complainants' money which was received as consideration for the execution of the contract.

It was urged in the original briefs, and it is contended quite at length in the petition for rehearing by the "old" bank, that some of these agreements for the repurchase of these securities were the personal agreements of Gleason rather than the obligations of the "old" bank. The finding of the master is to the effect that the agreement to repurchase appeared in typewritten form on each of the statements given to complainants at the time of each purchase; that the money for the purchase was paid to and received by the "old" bank, and that in several instances the bank recognized

these agreements by repurchasing some of the bonds from complainants under the terms thereof. In this last respect, this case is clearly distinguishable from *Mead v. Altgeld,* 136 Ill. 298; *Kinser v. Calumet-Fire Clay Co.,* 165 Ill. 505; and *Braun v. Hess & Co.,* 187 Ill. 283, which (as requested by the solicitors of the "old" bank in their petition for rehearing) we have carefully re-examined and find to be inapplicable.

It is suggested that the representations made when the bonds were sold to complainants referred only to the value of the property and therefore cannot be held to amount to actionable fraud, and that scienter must also be proved. *Wharf v. Roberts,* 88 Ill. 426; *Dowden v. Wilson,* 108 Ill. 257; *Holdom v. Ayer,* 110 Ill. 448; *Murphy v. Murphy,* 189 Ill. 360, are cited. There is no question about the general propositions of law stated in the opinions in those cases, but the facts here show gross misrepresentations of actual facts and the proof of knowledge of the falsity of the representations made by the representatives of the "old" bank in its behalf was abundant. The master found (and the chancellor approved the finding) that there was fraud in fact with knowledge. We have carefully examined the evidence bearing on this point and cannot say that the finding of the master as approved by the chancellor is against the manifest weight of the evidence.

It is urged that the "new" bank was an innocent purchaser of complainants' note for value, but, as already stated, the "new" bank took the note after maturity, and that defense, even if it were true in fact, cannot avail. *Justice v. Stonecipher,* 267 Ill. 448. Moreover, Gleason, vice president and manager of the bond department of the "old" bank, who sold these securities, was an officer and director of the "new" bank. Several other officers and directors of the "old" bank became officers and directors of the "new" bank.

These facts were sufficient to establish notice to the new corporation. *Simmons v. Roseland Security Vault Co.,* 331 Ill. 563.

It is suggested that the interest of Gleason was adverse to that of the bank and that the general rule would therefore not be applicable. *Seaverns v. Presbyterian Hospital,* 173 Ill. 414, is cited, but we find nothing in the evidence that would justify a finding that the exception to the rule is applicable. The only reason for granting this rehearing was that the question of whether the "new" bank was personally liable for the obligation of the "old" bank to these complainants might be re-examined. This is the only question concerning which the court entertained any serious doubt, namely, whether a personal judgment for the amount found due in complainants' favor upon the accounting between complainants and the "old" bank should have been entered.

The report of the master is to the effect that the "new" bank is not personally liable, but the report contains no statement of the particular facts or rules of law which in the opinion of the master compelled that conclusion. An exception of complainants to this finding of the master was sustained by the chancellor.

The original briefs of complainants argued that the "new" bank was personally liable by reason of its failure to comply with the Bulk Sales Law, Cahill's St. ch. 121a, ¶ 1 *et seq.* See Laws of Illinois, 1913, p. 258. Complainants cite to this point *Johnson Co. v. Beloosky,* 263 Ill. 363, and *LaSalle Opera House Co. v. LaSalle Amusement Co.,* 289 Ill. 194. Complainants also point out that the Bulk Sales Act of May 13, 1905, was held unconstitutional in *Off & Co. v. Morehead,* 235 Ill. 40, as being discriminatory and unconstitutional in that it selected a class of persons, namely, owners of stocks of merchandise, and subjected them to special burdens and obligations. That case was

followed in the later case of *Pogue v. Rowe,* 236 Ill. 157. The Act of 1913 provides that it shall be applicable to sales, transfers and assignments of a stock of merchandise, or merchandise and fixtures or "other goods and chattels of the vendor's business." In *Johnson Co. v. Belobsky, supra,* this act was held constitutional and applicable to a bakery business. In the *LaSalle Amusement Co.* case the law was also held applicable to the transfer and sale of the lease, furniture, fixtures and good will of a theater business.

It was argued in that case that the law was applicable to all personal property employed by nontrading or nonmercantile corporations, but the court held, citing *Weskalnies v. Hesterman,* 288 Ill. 199, that "the act did not apply to farmers but only to those engaged in selling merchandise, commodities and other wares." In *People v. Sherrard State Bank,* 258 Ill. App. 168, where the assets of one bank had been transferred to another, it was held that the phrase "and other articles, goods," etc., in the Bulk Sales Act meant the articles and goods of the same kind as previously enumerated in the act. Complainants say that the *LaSalle Amusement Co.* case was not called to the attention of the court there, but we see nothing in that case which could have possibly persuaded the court to a contrary conclusion.

The Bulk Sales Act is in derogation of the common law and therefore strictly construed. *Superior Plating Works v. Art Metal Crafts Co.,* 218 Ill. App. 148; *Stony Island Trust & Savings Bank v. Stony Island State Sav. Bank,* 240 Ill. App. 195. We hold that the act is not applicable to the transaction between the "old" and the "new" bank and that it is not generally applicable to a transfer of the assets of a banking corporation.

It is next contended that the "new" bank is liable to complainants because the "old" bank was trustee for

complainants after demand, and that the "new" bank expressly assumed trust liabilities. The theory seems to be that the "old" bank by reason of its fraud and deceit in this transaction became liable as a trustee to complainants upon its refusal to carry out the obligations of its contracts as agreed. *People v. American Trust & Savings Bank,* 262 Ill. App. 458; *In re Northrup,* 152 Fed. 763, are cited. The contract of the "new" bank, however, obligated it, with items specifically assumed, to pay only "trust department deposits." The claim of complainants does not answer this description. Moreover, we hold that the mere failure of the "old" bank to perform its obligations would not impress a trust upon any part of its assets in favor of complainants. The cases cited are clearly distinguishable. The contract of the "new" bank did not obligate it expressly to assume the obligation disclosed by this record either upon the theory that the same was found due upon the accounting, was a deposit, or impressed with a constructive trust.

The decree in this case found that the " 'new' bank, by taking over all of the assets of said 'old' bank, assumed such liability and is therefore liable to complainants to the same extent as the 'old' bank is liable." In conformity with that finding a personal judgment against the "new" bank jointly with the "old" was entered, and in the former opinion this court sustained that part of the decree upon the theory that the assets of the "old" bank was a trust fund for the benefit of its creditors and that the conduct of the "new" bank with respect thereto had been such as to render it personally liable. After re-examination of the record, we think it can hardly be said that the cause was brought or tried upon that theory. Paragraph 11 of the bill states that the "new" bank took over the assets of the "old" bank with the aim and object of relieving it from its obligations on the bonds sold by it to the

general public. Paragraph 16 of the bill avers that by reason of the fact that the "old" bank turned over all of its assets to the "new" institution, a judgment at law would be of no avail, and that complainants ought to be decreed to have a lien on all the assets acquired by the "new" bank. Paragraph 17 of the bill avers upon information that no consideration whatever was paid to the "old" bank for the assets transferred to the "new." The bill does not explicitly aver any fraudulent intention on the part of the "new" bank, nor does it anywhere aver alleged liability of the "new" bank other than by reason of its possession of assets it obtained by transfer from the "old" bank. The bill therefore does not seem to have been framed upon the theory that the "new" bank was liable to the full amount claimed by complainants upon the trust fund theory.

Neither was this question raised by objection or exception to the master's report. There was an exception to the finding of the master that the "new" bank did not assume the obligations of the "old" bank (not upon the trust fund theory), but apparently, for the reason, as claimed, that the "new" bank was liable because it expressly assumed such liability. Therefore, since the bill was not brought nor the case tried upon the trust fund theory, it is apparent that the doctrine was erroneously applied, in the former opinion of this court.

The briefs of complainants and their reply to the petition for rehearing cite a number of cases where a corporation has been held liable for claims against its predecessor in business,—some upon the theory that there was a consolidation, others that there was a merger, others that defendant was a successor in business, others that there was a *de facto* consolidation and some upon the theory that the capital stock and assets of the old institution were a trust fund for the creditors.

· The doctrine that the capital stock of a corporation is a trust fund for creditors seems to have been first announced in this country in the case of *Wood v. Dummer,* 3 Mason's Report 308, where the opinion of the court was rendered by Justice Story. It has been expressly held in Illinois that the doctrine is not applicable except when the corporation is insolvent or when the transaction injuriously affects creditors directly. *Johnson v. Canfield-Swigart Co.,* 292 Ill. 101. The opinion in that case points out that it had been said upon good authority (4 Thompson on Corp., 2d ed., secs. 3421, 3422) that the trust fund theory had been abandoned and that the rights of creditors were worked out upon the doctrine of fraud. Our Supreme Court, however, said:

"We think it is more accurate to say that both doctrines are still recognized in those States where the trust doctrine has been enforced, and that each one of them is applicable only in the cases where the respective doctrines properly apply to the particular facts to be considered."

In the Cumulative Supplement to the second edition of Thompson on Corporations, sec. 3421, p. 616, the author sums up the status of the trust fund doctrine as follows:

"The trust fund doctrine is now generally construed to mean no more than that the assets of a corporation constitute a trust fund upon which the creditors have an equitable lien for the payment of their debts, superior to the rights of the stockholders. The doctrine does not prevent a corporation from disposing of the whole or any part of its assets for value and in good faith, and where it does so, the purchaser takes the assets discharged from any trust in favor of the creditors of the selling corporation." The cases are collected in a note to *Skirvin Operating Co. v. Southwestern Electric Co.,* 71 Okla. 25, 174 Pac. 1069, 15 A. L. R. 1112; in a note to *American Ry. Express Co.*

v. *Commonwealth of Kentucky,* 190 Ky. 636, 228 S. W. 433, 30 A. L. R. 543, also in a note to *Davis v. Hemming,* 101 Conn. 713, 127 Atl. 514, 39 A. L. R. 143. An examination of these cases discloses that the trust fund doctrine where it is applied has its basis in the abhorrence with which a court of equity regards any scheme or device which results in the perpetration of a fraud. The cases in which the doctrine has been considered are usually quite complicated as to the facts so that it is not difficult to find grounds upon which any one of them may be distinguished from any and all the others.

The petition for rehearing filed in behalf of the "new" bank presents an analysis of the cases cited in our original opinion: *Northern Pac. Ry. Co. v. Boyd,* 228 U. S. 482; *Valley Bank v. Malcolm,* 23 Ariz. 395, 204 Pac. 207; *First Nat. Bank in Carmen v. Willis,* 128 Kan. 681, 280 Pac. 782, and many other cases. A number of cases have been cited by complainants also in their reply. Deserving attention, we think, is *American Ry. Express Co. v. Commonwealth,* 190 Ky. 636, where a new company which took over all the assets of an old one within the State was held personally liable for the debts of its predecessor, it appearing that prior to the sale the old corporation had sufficient assets to meet all its obligations. There is no proof of that kind in this case.

In *Chicago Smelting & Refining Corp. v. Sullivan,* 246 Ill. App. 538, it appears from the opinion that this court was there requested to hold that where a corporation was organized to take over and continue the business of a firm, all the assets of the firm being transferred to it in exchange for its stock, the debts and obligations of the partnership would become the debts and obligations of the corporation without any express agreement to assume the liabilities. In that opinion we stated that a conflict of decisions on that point was

recognized, and that so far as we were informed the question had never been directly decided by our Supreme Court. In the same case upon a second appeal to this court, in 252 Ill. App. 259, we held the corporation to be liable only for such debts as it had assumed. The trust fund doctrine was not presented or relied upon in that case.

It is apparent here that it was not the intention of the parties to create a merger or consolidation of these two corporations, but, on the contrary, the "new" bank was taking the assets of the "old" for the purpose of liquidation. The agreement without question discloses the purpose to prefer a part of the creditors of the corporation to the exclusion of the others, and this is permissible in this State in the absence of fraud. *Hurt v. Ohlman,* 349 Ill. 163. The bill in this case did not specifically pray for relief by way of a personal judgment against the "new" bank, and we think the decree so far as it held the "new" bank personally liable for the deficiency was unwarranted.

As we stated in the former opinion, it was technically erroneous to render a judgment against the receiver of the "old" bank. Upon a reconsideration of the case, we think it must also be held that the court erred in entering judgment against the "new" bank in the sum of $17,265.25, plus interest. The decree will therefore be modified by striking therefrom the words "and Will H. Wade, its receiver, and Madison-Kedzie Trust and Savings Bank," and as thus modified will be affirmed.

*Affirmed as modified.*

McSurely, P. J., and O'Connor, J., concur.