The People of the State of Illinois ex rel. Oscar Nelson, Auditor, Appellee, v. Sherrard State Bank et al., Defendants and Appellees. Charles F. Schurr et al., Appellants.

Gen. No. 8,185.

Heard in this court
at the February term, 1930.       Opinion filed July 7, 1930.

GEO. W. WOOD and R. W. OLMSTED, for intervenor Gust Weiss. CONNELLY, WELD, WALKER & SEARLE and JAMES ALLEN, for other appellants.

WATSON & DUVALL, for appellees.

MR. JUSTICE JONES delivered the opinion of the court.

The Attorney General filed a bill to dissolve the Sherrard State Bank. The executor of the last will and testament of Stephen Goodlow, deceased, together with a number of others, as judgment creditors of said Bank, filed intervening petitions, by which they sought to have the assets of another bank, known as the Sherrard State Banking Company, segregated and applied ratably first to the payment of the said judgments, and then the overplus, if any, to other creditors. The petitions also prayed that in case the assets so to be segregated are insufficient to pay the said judgments in full, then the court may determine whether Andrew Russel is personally liable, by reason of his conduct, as then auditor of public accounts, in the disposition of the assets of the said State Banking Company. Upon a hearing, the chancellor denied the prayer of the intervenors and dismissed the petitions. From the order of the chancellor in that behalf, an appeal has been perfected to this court.

On September 5, 1923, the Sherrard State Banking Company was in failing circumstances and unable longer to carry on a banking business. Confronted

with this situation, its directors entered into an agree-·· ment with Sherrard State Bank, whereby the latter took over a large part of the assets of the Banking Company, and guaranteed the payment of depositors and certain other creditors of that institution, not including the intervenors. In fact, the intervenors were not then judgment creditors. Their claims arose out of alleged torts and were not reduced to judgment until a year or more thereafter.

Counsel for intervenors present a large number of propositions in support of their effort to have the decree reversed. Summed up, they are that the contract between the two banks was void as to the intervenors, first, because (a) it was inhibited by the Banking Act, Cahill's St. ch. 16a, ¶ 1 *et seq.,* (b) by the Criminal Code, Cahill's St. ch. 38, ¶ 38 *et seq.,* and (c) by the Bulk Sales Act, Cahill's St. ch. 121a, ¶ 1 *et seq.;* and second, because it was constructively fraudulent and an attempt to give a preference to a portion of the Banking Company's creditors.

The validity of that contract was before this court in *Sherrard State Bank v. Vernon,* 243 Ill. App. 122. In that case a suit was brought against certain directors of the Banking Company on a guaranty they had given the State Bank at the time the contract was entered into between the two banks. The directors defended on the ground that such contract was invalid. We held it was not invalid, but was binding and enforceable.

The intervenors in this case say that they are not bound by the decision in *Sherrard State Bank v. Vernon, supra,* because different issues and different parties are here involved; that the effect of certain statutes was not presented to or considered by the court in the *Vernon* case; and that the validity of the contract is now raised by persons who were not parties to the former suit and who are not estopped to raise

the question. In this contention, counsel are quite right. Because of the different parties, different interests and different questions involved, the doctrine of *res adjudicata* cannot be invoked against the intervenors. More than that, it is doubtful if the doctrine of *stare decisis* can be applied to an opinion of the Appellate Courts of this State, in view of section 17 of the Appellate Court Act, Cahill's St. ch. 37, ¶ 49, which provides that the opinion of such courts shall not be binding authority in any cause or proceeding, other than that in which it may be filed. However, the provisions of the Banking Act were considered by us in the *Vernon* case and our further study of them in connection with this case convinces us that the contract is in no wise contrary to the provisions of the Banking Act.

It was urged in that case that the contract was beyond the power of either bank to make, and therefore ultra vires; that the affairs of banks are controlled by statute; and that the only manner in which a bank in failing circumstances can dispose of its assets, or be wound up, is by action of the auditor of public accounts. This court decided that the contract did not contemplate a merger, a consolidation, or a dissolution of the Banking Company, and that it was manifestly not the object of the parties to dissolve such bank for some time, at least. We expressed the view that a course of conduct had been followed which is not uncommon where a bank is in a failing or perilous condition, and another bank or group of banks, in an effort to save it or prevent a "run," take over a large amount of its assets, in consideration of a guaranty to pay off its liabilities. It was said that "sound reasoning dictates that the directors of a bank in failing circumstances should have the right to enter into such a contract as the one here involved, not only as a matter of law, but as a matter of public policy."

A similar question was presented to this court in *Candor v. Mercer County State Bank,* 257 Ill. App. 192. It was held to be the general rule that where a bank is in failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the directors may dispose of the assets without the sanction of the stockholders, when it is deemed of imperative necessity. (*Oskaloosa Savings Bank v. Mahaska County State Bank,* 205 Ia. 1351, and cases collated in 5 A. L. R. 932, and 60 A. L. R. 1210.) It was further said that to deny this right would freeze the assets of such a bank and paralyze its opportunity to pay its creditors.

Section 4 of ''An Act for the Protection of Bank Depositors'' (Criminal Code, Cahill's St. ch. 38, ¶ 41) is claimed to render invalid the contract here involved. It provides that it shall not be lawful for any bank to assume payment of, or to guarantee to pay the principal of, or interest on, any bonds, notes, or other evidences of indebtedness of, for, or on account of any person or persons, company, or incorporations; and any assumption, liability, or guaranty, whereby the deposits or trust funds of the guarantor bank can be jeopardized or impaired, shall be null and void. We are of the opinion that this contention is untenable and is without avail to the intervenors. In the first place, the statute, by its terms, would only render the assumption of liability of the Sherrard State Bank null and void, in case it resulted in jeopardizing or impairing the deposits or trust funds of the guarantor bank. It would not necessarily render the entire contract invalid, but only the assumption clause. The transfer of the assets from the Banking Company to the Mercer County State Bank would still be operative. But however that may be, the only persons who could be prejudiced by the guaranty or assumption of liability by the State Bank would be its stockholders, de-

positors, and creditors. None of them are complaining because of such guaranty. The intervenors are not interested in the State Bank, either as stockholders, depositors, or creditors. Their interest is in the Banking Company, whose deposits and liabilities were assumed and guaranteed. Such assumption was made for the benefit of the Banking Company, of which the intervenors are judgment creditors. Under the circumstances, they were not prejudiced by the assumption of liability. They have no right to complain or ask that a decree of court be reversed on that account.

Counsel for intervenors vigorously urge that the transfer of assets by the Bank Company to the Sherrard State Bank was in violation of the Bulk Sales Law, and therefore void as to them. As hereinbefore stated, the claims of the intervenors arise out of alleged torts. Stephen Goodlow left certain notes payable to him with the Banking Company for collection. The cashier collected principal and interest to the amount of $7,758.18 and failed to account to Goodlow. The record does not show that such failure to account was known to the State Bank at the time the contract was made. On October 28, 1918, nearly four years before the contract in controversy was entered into, the Banking Company was robbed and a number of Liberty Bonds of patrons of the bank was stolen. Some three years afterwards, a few of such patrons made demands upon the bank to restore the bonds or their equivalent, but they did nothing else in respect to them. A year or more after the Banking Company had transferred a large portion of its assets to the State Bank, these patrons obtained judgments by default against the Banking Company and became the intervenors in this proceeding. The chancellor held that the intervenors were not creditors on September 5, 1923, within the meaning of the Bulk Sales Act, and further that the act has no application to the transaction in question.

In order to determine whether the Bulk Sales Act has any application to the transfer of the whole, or a major portion of the assets of a bank, it is well that we look to the history of the legislation and judicial decisions in this State. The first Bulk Sales law was enacted in 1905 and was entitled "An Act to Prevent the Sale of Merchandise in Fraud of Creditors." The Supreme Court, in *Off & Co. v. Morehead,* 235 Ill. 40, held the act unconstitutional on the ground that the statute arbitrarily selected a class of individuals, to wit, those who owned "stocks of merchandise" and subjected them to special burdens and obligations, from which other persons similarly situated, were exempted. Following this decision, the present Bulk Sales Law was enacted and entitled, "An Act to regulate the sale or transfer of goods, wares, merchandise, and other chattels in bulk and to provide certain penalties in connection therewith." It provides that the sale, transfer, or assignment in bulk of the major part or the whole of a stock of merchandise, or merchandise and fixtures, or other goods and chattels of the vendor's business, otherwise than in the ordinary course of trade and in the regular and usual prosecution of business shall be fraudulent and void as against the creditors of the said vendor, unless the provisions of the Act are complied with.

The Supreme Court in *Off & Co. v. Morehead, supra,* in discussing the discrimination which the act of 1905 made against owners of stocks of merchandise, enumerated several other kinds of property of similar character, which the act should have brought within its domain. In this enumeration are machinery, tools, finished articles, and raw materials of the manufacturer; livestock, farm implements, crops, and household goods of the farmer; the business and the property of the hotel keeper; the rolling stock, harness, and horses owned by a livery or transfer company; the presses, printing machinery, and appliances of a pub-

lisher; the mining tools and implements of a mine owner; and the machinery, grain and products on hand of a miller. It will be observed that the property mentioned, as being of the same kind and character, and which ought to be included within the purview of legislation relating to the sale of goods and chattels, in bulk, is exclusively tangible property. There is no language contained in the opinion of the Supreme Court from which even an inference may be drawn that the act of 1905 was objectionable because it did not seek to regulate the transfer or sales of intangible property. The legislature, by its enactment of 1913, had before it the decision of the Supreme Court, and undertook to obviate the objections to the Act of 1905. The new act came before the Supreme Court in *Johnson Co. v. Beloosky,* 263 Ill. 363, and was pronounced valid. By the language of the act, it deals with sales, in bulk, of (1) stocks of merchandise, (2) merchandise and fixtures, and (3) other goods and chattels of the vendor's business. There is no contention made that the assets of a bank are either a stock of merchandise or merchandise and fixtures. If such assets are to fall within the purview of the Bulk Sales Act, they must be deemed to be "other goods and chattels of the vendor's business." Reviewing the history of the legislation on this subject, we are constrained to the belief that "other goods and chattels of the vendor's business" includes only that class of goods and chattels, which are of the character and type of goods and chattels mentioned in *Off & Co. v. Morehead, supra;* to wit, tangible property.

There has been a strong effort made to procure uniformity of laws among the various States. Within the field where this endeavor has been made are found Bulk Sales Laws, Negotiable Instruments Laws, and a few others. Fully three-fourths of all the States have enacted Bulk Sales Laws, and after diligent study, we

have been unable to find a holding in any jurisdiction, that the Bulk Sales Law includes within its purview, sales and transfers of intangible property. It is a general rule of law that where a number of items are enumerated in a legislative enactment and then supplemented with the term "and other articles, goods" etc., such term means other articles and goods of the class and kind previously enumerated. The class and kind previously enumerated in the Act of 1913 consist only of tangible property, and the Supreme Court in *Johnson Co. v. Beloosky, supra,* has, in our belief, given sanction to the law with that aspect.

Section 40 of the chapter entitled "Judgments, Decrees, and Executions," Cahill's St. ch. 77, ¶ 41, provides that all goods and chattels, real or personal, may be taken and sold on execution, except as otherwise provided by law. In *Crawford v. Schmitz,* 139 Ill. 564, 566, a constable levied an execution upon a trunk and contents and sold them for $8. About a week after the sale, a promissory note for $2,000 with two interest coupons for $65 each, secured by a deed of trust, and also a number of negotiable bonds, were discovered in the bottom of the trunk. It was held that the purchaser derived no title to the notes and bonds, because the words "goods and chattels," as used in that statute, do not include *choses in action* and other intangible property. The words "personal property" employed in section 254, and the words "goods and chattels" in section 137 of the Revenue Act, Cahill's St. ch. 120, ¶¶ 269 and 155, are held to mean only that species of personal property which is subject to levy and sale under execution. (*Loeber v. Leininger,* 175 Ill. 484.) The words "goods and chattels" as used in section 7 of the Statute of Frauds, Cahill's St. ch. 59, ¶ 7, "are the visible and tangible articles and personal property of which actual possession may be had and delivered." (*Davis v. Hincke,* 264 Ill. 46.) The words

"goods and chattels" as used in section 137 are to be construed as having the same meaning and as comprehending only such personalty as may be made subject to levy and sale under an execution upon a judgment at law. They do not extend to personal property of the character of tax certificates, which are mere *choses in action.* (*Heinrich v. Harrigan,* 288 Ill. 170.)

It would be a strained construction to say that ordinary assets of a bank are included within the species of property cognizable under the Bulk Sales Law. We do not believe that it was the intention of the legislature to include such property. The Bulk Sales Law is in derogation of the common law and must be strictly construed. (*Superior Plating Works v. Art Metal Crafts Co.,* 218 Ill. App. 148.) In view of our conclusion, that the act has no application, it is unnecessary for us to decide whether or not the intervenors were creditors of the Banking Company on September 5, 1923.

Lastly, the transfer between the banks was not constructively fraudulent or an attempt to give a preference to a portion of the Banking Company's creditors. From what we have said in this case, and in *Sherrard State Bank v. Vernon, supra,* it is apparent that we believe the bank transfer, conducted as it was under the supervision of the State auditor, was for the sole purpose of preventing the collapse of the Sherrard State Banking Company and consequent embarrassment and disaster to the community.

For the reasons we have announced, the decree of the chancellor is affirmed.

*Decree affirmed.*