People of the State of Illinois ex rel. Edward J. Barrett, Plaintiff, v. Halsted Street State Bank, Defendant.

Charles S. Deneen and Roy Massena, Appellees, v. Charles H. Albers, Appellant.

Gen. No. 39,642.

Opinion filed May 3, 1938.   Rehearing denied May 17, 1938.

GEORGE F. BARRY, of Chicago, for appellant; FRANCIS L. BRINKMAN and WILLIAM J. McGAH, both of Chicago, of counsel.

DONALD N. SCHAFFER, of Chicago, for appellees.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Charles S. Deneen and Roy Massena, copartners under the name of Deneen, Healy & Lee, filed an intervening petition in the dissolution proceeding, People ex rel. Barrett, auditor of Public Accounts, v. Halsted Street State Bank, seeking allowance of a claim against the estate of the bank, then in the hands of

William L. O'Connell, as receiver, for legal services rendered in connection with reopening the bank or for the reorganization thereof. The receiver answered the petition and the cause was referred to a master in chancery, who recommended the allowance of a common claim against the receivership estate for $7,831.92 and costs. The receiver's exceptions to the master's report were overruled, and a decree was entered in accordance with the master's recommendations, from which the receiver, respondent to the petition, appeals.

From the evidence adduced before the master it appears that on March 6, 1933, under presidential proclamation, a bank holiday was declared throughout the United States, and the Halsted Street State Bank was closed along with all other banking institutions, and its ordinary banking transactions were thereby suspended. This proclamation was continued in effect until a further proclamation was promulgated by the President of the United States on March 10, 1933, providing in effect that the appropriate authority having immediate supervision of banks in each State or place subject to the jurisdiction of the United States, should be empowered, under such regulations as might be prescribed, to permit any banking institution to perform any and all of their usual banking functions. Pursuant to these proclamations the auditor of public accounts of this state placed a representative on the premises of the Halsted Street State Bank. Shortly thereafter the auditor of public accounts determined that the stockholders of the bank would be required to contribute an additional $300,000 in cash in order to reopen the bank on an unrestricted basis. The officers and directors discussed the matter and felt that it was impossible to raise so large an amount in cash. Accordingly, a plan was conceived for organizing a national bank to take over the assets,

assume a percentage of the deposit liabilities of the State bank, and secure waivers for the remaining deposits. For the purpose of considering this proposition, a meeting of the board of directors was regularly called and duly held in the offices of the bank Saturday, April 22, 1933, at which all the directors of the bank were present. Henry F. Eidmann, president and director, outlined the proposal as a basis for the discussion that ensued, and it was suggested that Charles S. Deneen, because of his experience in banking matters and his connections in Washington, would be more helpful than any man available in procuring a national banking charter, and in helping to effect the proposed reorganization. Thereupon Mr. John E. Traeger, one of the directors, suggested the employment of Mr. Deneen for that purpose, and a resolution was adopted by the unanimous vote of all the directors that Mr. Deneen and Roy Massena, his associate, constituting the law firm of Deneen, Healy & Lee, be retained to render services in connection with the reopening of the bank or for the reorganization thereof. No minutes of this meeting were written up, because the minute book of the bank was then in the custody of the auditor's representative.

May 12, 1933, Herbert W. Eidmann, vice president, and Henry Kloese, cashier of the bank, called on Mr. Deneen and retained his services. It was agreed that the employment should be on a *per diem* basis, and the amount of compensation was neither fixed nor contingent. Pursuant to the employment petitioners took steps to complete the organization of a new national bank to take over the bank building and certain assets of the State bank, and to assume 50 per cent of the deposit liabilities thereof. Although the evidence as to the services rendered is not disputed, petitioners' testimony as to the nature of the services rendered and the time expended was corroborated not only by

the bank's officers but also by Paul R. Wilkinson, the auditor's representative, with whom most of the negotiations with that office were conducted. They are set forth in detail in a statement which was attached to the petition and admitted in evidence, and may be briefly summarized as follows: Mr. Deneen made two trips to Washington in connection with the proposed reorganization, after the request for a conversion of the bank to a national bank had been denied. He had conferences with officials of the treasury department and the comptroller's office, and was assured that a national bank charter could be secured. He also had conferences with officials of the Reconstruction Finance Corporation, resulting in an agreement to increase the R. F. C. loan at the bank from $120,000 to $180,000. The total amount of time consumed for services in Washington aggregated 6½ days. In connection with the plan, petitioners had numerous conferences with representatives of the auditor of public accounts in this State concerning the details of the plan, the assets to be taken over, the valuation of the bank building, discussion of proposed contracts, and the question of the liquidation or purchase of certain municipal bonds. Twenty-seven such conferences are itemized in petitioners' statement and incorporated in the record. There were also conferences with the chief national bank examiner in Chicago, at which were discussed details of the contract to be entered into between the State bank and the new national bank, the assets to be taken over, the methods of protecting the waived deposits, and the requirements of the treasury department and of the R. F. C. with reference to the bank's loan. Numerous agreements were drawn by petitioners at the suggestion of these various officials, and redrafted from time to time to comply with their requirements. The total time necessarily consumed for these services, from May 12, 1933, to December 19,

1933, when the receiver was appointed, aggregated 295½ hours, or 49½ days, for which petitioners claimed the aggregate sum of $9,012.50. Subsequent to the appointment of the receiver, petitioners rendered further services in connection with the auditor's proposal to reorganize the bank by assessing the stockholders, by appearance in the dissolution proceedings, and in connection with a proceeding filed in the circuit court of Sangamon county, Illinois, to restrain the auditor from further proceedings against the bank, and in an interpleader suit filed by the Aetna Casualty Company, wherein the bank was made a party. These services, rendered from December 20, 1933, to September 8, 1934, consumed 79 hours, or 13 1/6 days, for which petitioners claimed the aggregate sum of $1,975. The master found that the fair and reasonable value of the services rendered by petitioners was $150 a day for services rendered in Chicago, and $250 for services outside the city, recommended an allowance of $7,831.92, and $154.25 as costs, and the decree awarded petitioners these respective sums.

It appears from the evidence that the proposed plan of reorganization was agreeable to the national bank examiner and the State auditor, and both of these officials and other governmental supervising agencies cooperated with petitioners and the officers and directors of the bank in making the plan effective. However, the plan failed of consummation only because of a decline in the securities market during the summer of 1933, making it impossible to comply with the requirements of the banking officials, and was ultimately abandoned December 18, 1933, and a receiver was appointed the following day.

It is first urged by the receiver that petitioners were not acting as attorneys for the Halsted Street State Bank, but for a reorganization committee and for the officers and stockholders of the bank, who were inter-

ested in "saving their jobs" and salvaging part of their stock investment and who incidentally were anxious to avoid their statutory and constitutional stock liability for an additional 100 per cent assessment. The evidence discloses that at the date of the employment of petitioners there was in existence a committee, consisting of certain officers and directors of the bank, known as "an organization committee for the South Town National Bank." This committee was formed about April 15, 1933, and functioned until the appointment of the receiver in December, 1933. The principal function of this committee was to solicit subscriptions to the stock of the proposed new bank. It is inferentially argued by counsel for the receiver that petitioners were retained by this organization committee, and not by the bank. However, the evidence clearly indicates that petitioners were employed pursuant to a resolution adopted by the unanimous vote of all the directors, at a regularly called meeting held April 22, 1933. Three of the seven directors of the bank and two of its officers testified concerning the adoption of this resolution, the master so found, and there is no evidence to the contrary. Moreover, it appears that the director who suggested petitioners' employment and made the motion for that purpose was John E. Traeger, not a member of the organization committee. The implication of the receiver that the directors of the bank were motivated only by the fact that they desired to save their "jobs" and avoid the statutory liability as stockholders is wholly without foundation. Only 50 per cent of the bank's deposits were to be assumed by the national bank, and since there is nothing in any of the contracts providing for the release of the liability of stockholders as to the unwaived deposits, it is apparent that the stockholders would not be released as to the balance. Furthermore, the officers and directors were large stockholders of the bank. Five

of the principal directors held 645 shares of the 2,000 shares of stock, and in connection with the auditor's plan for an assessment against the stockholders these directors had agreed to pay such assessment, which in their case would have amounted to a substantial sum. These directors had also subscribed for a substantial amount of the stock of the new national bank, and were apparently willing to use their own resources to the extent of their ability in order that the bank might continue to operate and thus help its creditors to immediately realize a large part of their deposits.

The receiver questions the good faith of petitioners, as well as the bank officers and directors, in attempting to reorganize the bank. It is argued that the creditors were the real persons in interest when the bank was closed; that the bank could not pay its depositors, and was therefore insolvent; that this was known to everyone, including petitioners and the officers and directors. Relating to the question of insolvency, it appears from an examination made by the State auditor March 23, 1933, that the bank's total assets amounted to $1,631,047.73 (including $105,282.43 in cash and due from banks, $79,253.59 in United States bonds, $679,945.68 in other bonds, and $542,085.33 in loans on real estate and other securities). The books of the bank showed total liabilities (exclusive of capital stock, surplus and undivided profits) of $1,294.967.42 (including deposit liabilities of $1,074,376.65, and bills payable of $121,500). Included in the total liabilities was a reserve for bond depreciation, amounting to $62,088.07. The capital stock of the bank was $200,000, the surplus fund $100,000, and the undivided profits $36,080.31. Thus the bank's books disclosed assets amounting to $398,168.38 in excess of its liabilities, and although the auditor's examination made no finding of insolvency he determined that the bank's books did not reflect the true value of its assets, that the capital

stock was impaired, and that the business of the bank was being conducted with an insufficient portion of its assets in cash or readily convertible securities. This impairment of the capital stock and depreciation in assets was due primarily to a decline in the securities market and the general economic conditions prevailing at that time, and the State auditor's requirements of $300,000 additional cash for the reopening of the bank on an unrestricted basis was not predicated on the bank's insolvency, but to replace assets of doubtful value. From the auditor's report it appears that the actual value of the assets at that time, taking into account the additional $300,000 required, exceeded the liabilities by almost $100,000.

The courts of this State have heretofore had occasion to discuss and define what constitutes the insolvency of a bank. In *People v. Clark,* 329 Ill. 104, the Supreme Court held that a bank is insolvent (p. 113) "when the cash value of its assets realizable in a reasonable time, in case of liquidation by its proprietors, as ordinarily prudent persons will generally close up their business, is not equal to its liabilities *exclusive of stock liabilities.*" (Italics ours.)

In *People v. Gould,* 345 Ill. 288, it was held that the impairment of the capital of a bank did not necessarily mean insolvency, and that in the determination of that question the original amount of the capital stock, the surplus and the undivided profits should be deducted from the total liabilities. The same rule was announced in *People v. First State Bank,* 274 Ill. App. 46.

Applying these decisions to the financial condition of the bank as hereinbefore summarized, it appears that the liabilities of the bank, as of March 23, 1933, amounted to $1,294,967.42, as against assets of $1,631,047.73, or an excess of assets over liabilities of $398,168.38. The condition of the bank at the time of the moratorium is best indicated by the attitude of the auditor of

public accounts, who, although he found a depreciation of assets and an impairment of capital, did not assume control of the bank pursuant to the Banking Act until six months later, and the receiver was not actually appointed until December 19, 1933, which was nine months after the auditor's examination was made, and during all this period the auditor cooperated with the officers and directors of the bank in their plans to reorganize. In view of these circumstances, it is idle to argue that the services rendered by petitioners and the desire of the directors and officers to reorganize the bank were not actuated by the utmost good faith. If the plan of reorganization had been consummated, the creditors, as well as the directors and stockholders of the bank, would have been benefited thereby.

In a supplemental brief filed by the receiver since this cause was heard on oral argument, it is urged that attorneys' fees are not allowable from funds in the hands of a receiver unless such services aided in creating, preserving and protecting the fund. This proposition is not advanced as a defense in the receiver's answer, nor was it urged before the master or chancellor on exceptions to the master's report. The appeal is prosecuted from an order allowing a claim against the estate of the bank in the hands of the receiver, payable in due course of administration with all other claims against the bank, and should not be confused with claims against funds in the hands of a receiver, such as the expense of administration and fees for services rendered directly to the receiver in creating or preserving funds in his hands. The latter class of cases is governed by general equitable principles which favor the compensation of services for attorneys which have resulted in a benefit to a class by reason of a fund created or a fund preserved or protected for the benefit of all the beneficiaries. These services were rendered to the corporation and not for the benefit of a class having claims against funds in the hands of the

receiver, and except for the fact that a liquidation proceeding was pending when the intervening petition was filed, petitioners might just as well have filed a suit at law against the receiver, with the permission of the court having jurisdiction of the dissolution suit. Under the circumstances, this claim is one at law, and is not governed by equitable principles, as the receiver contends.

It is next urged that the act of the directors authorizing the services to organize the new national bank was ultra vires the powers of the corporation and void. In this connection counsel for petitioners call our attention to the fact that in the receiver's answer to the petition, the only questions raised were, first, a denial that petitioners were employed by resolution of the board of directors of the bank, and second, that the officers and directors of the bank were without authority to employ petitioners, because at the time of the appointment and during the period of their services the bank was in the hands of the State auditor and subsequently in the possession of the receiver. When the evidence adduced before the master conclusively showed that petitioners were employed by the bank pursuant to a resolution of its board of directors, the first defense became untenable, and the receiver then argued the second proposition before the chancellor. This defense likewise failed, because the law is clearly to the effect that the filing of a dissolution proceeding and even the appointment of a receiver does not *ipso facto* dissolve a corporation or completely restrict its corporate functions (*People ex rel. Barrett v. West Side T. & S. Bank,* 362 Ill. 607, 616), and the receiver now concedes that to be the rule of law for he says in his brief: "We agree that under the law, the appointment of a receiver does not automatically dissolve a corporation, or completely restrict its function as a corporation."

As a result of the failure of these two defenses the receiver now takes the position that the steps taken to organize a national bank to take over the business of the State bank was not a reorganization, but his answer seems to be in conflict with this contention for he avers: "This respondent states that the reopening of the Halsted Street State Bank contemplated the organization of a new bank, to be known as the South Town National Bank, which new bank was to take over the assets of the Halsted Street State Bank. . . . " The word "reorganization," as applied to corporations, is defined in 8 Thompson on Corporations (3rd Ed.), p. 4, as follows: "Reorganization simply means the act or process of organizing again or anew. In the law of corporations, it means only what the term itself indicates, that a corporation has by some process organized anew; and yet it implies that some of the features of the old corporation are retained. . . . A reorganization is usually effected by the dissolution of one and the organization of a new corporation to take the property and franchise of the first and to continue its business." Under the plan for which petitioners rendered legal services the reorganization of the State bank was to be effected by the creation of a new bank to continue the business of the old one by taking over the bank building and part of its assets in exchange for an assumption of part of its liabilities. Apparently everybody, including the State auditor, treated it as a reorganization. Mr. Wilkinson of the auditor's office testified that, "the question of fees and expenses in connection with the reorganization was discussed during the conferences," and when the auditor submitted a proposal to the depositors for a reorganization by assessing the stockholders, in March, 1934, he stated in his memorandum that waivers of deposits had already been obtained, "in connection with the previous reorganization plan."

Reorganizations of the nature here contemplated have been recognized by the courts in this State. The power of a bank to reorganize by entering into a contract with another bank to assume its liabilities and take over its assets was considered and approved in *Sherrard State Bank v. Vernon,* 243 Ill. App. 122, and *People v. Sherrard State Bank,* 258 Ill. App. 168, and petitioners' counsel say that this method of reorganization became so common, especially during the period of depression, that the legislature deemed it desirable to give it express recognition in order that the State auditor might be given supervisory powers over such reorganizations, and accordingly passed an act in 1929 which was ratified by referendum November 4, 1930 (ch. 16½, sec. 12, p. 194, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 10.13]). Furthermore, the Banking Act imposes the duty upon the State auditor of assuming control of a bank "for the purpose of reorganization or liquidation through receivership," and before he is authorized to appoint a receiver he must determine that the bank cannot reorganize. (Ch. 16½, sec. 11, p. 191, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 10.11].) Manifestly, the auditor cannot undertake proceedings necessary to reorganize a bank. If a reorganization is to be effected it can be done only by the bank, acting through its officers and directors in cooperation with the State banking authorities.

In support of the receiver's argument that the act of the directors authorizing the services of petitioners to organize the new national bank was ultra vires the corporation and void, his counsel say that they have searched diligently for precedent where the question was considered whether the receiver of an old, insolvent bank is liable for attorneys' fees where an unsuccessful attempt is made to organize a new corporation to take over some of the assets and liabilities of the old, but have found no such cases. However, coun-

sel cite *Assets Realization Co. v. Defrees, Brace & Ritter,* 225 Ill. 508. This case was originally cited by counsel for petitioners before the chancellor for the purpose of showing that even *after* the appointment of a receiver for a corporation under the supervision of the State auditor, a corporation has authority in law to employ counsel to resist such receivership, and that, even though efforts in that respect are unsuccessful, compensation for services, if rendered in good faith, is payable out of the receivership estate. That decision does not support the contention that the proposed reorganization of this bank was ultra vires. *People v. Commercial Alliance Life Ins. Co.,* 148 N. Y. 563, and *Witherspoon v. Hornbein,* 70 Col. 1, are also cited under this point, but it appears that in both of those cases attorneys' fees were denied because the facts showed that the services were rendered in defense of unlawful acts of officers and directors, rather than to preserve the corporate existence.

Lastly, it is urged as ground for reversal that the claim of petitioners for attorneys' fees "is outside the jurisdiction of the court." It must be conceded, of course, that under sec. 11, ch. 16½, Banking Act (Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 10.11]), the court had jurisdiction of the subject matter, but the receiver argues that only claims in existence when the bank closed may be filed in the dissolution proceeding. This contention is answered in *People v. West Side T. & S. Bank,* 362 Ill. 607, where, after citing the fact that the auditor and receiver had availed themselves of the processes of the court in the dissolution case, the court said (p. 618): "We find no language in section 11 which can be distorted to mean that the orderly dispatch of the business of courts should be upset by requiring the services of other courts for purposes that can be performed by the one. The court in charge of the liquidation of a bank is not a mere conduit for

the benefit of the receiver." It would appear that a claim for services in connection with the reorganization of a bank, rendered prior to the appointment of a receiver, if it may be allowed at all, is such a claim as comes within the contemplation of the Banking Act. Most of the services in the case at bar were rendered *prior* to the appointment of the receiver, and under the authority of the *Defrees* case, *supra,* services rendered *after* the appointment of the receiver, in resisting the receivership, may be proper claims against the receivership estate.

In connection with his first point, the receiver contends that the services rendered by petitioners subsequent to the appointment of the receiver were not covered by the resolution of the directors, which pertained only to the reorganization into a national bank. The evidence discloses that these services constituted a small portion of the aggregate services rendered by petitioners, and the value was slightly less than $2,000. On the basis of the rate of compensation found by the master to be reasonable, the claim as allowed for $7,831.92 is less than the total value of the services rendered prior to the appointment of the receiver. Furthermore, it clearly appears from the record that these services were rendered at the direction of the bank's officers and consisted principally of the filing of the appearance of the bank in the dissolution suit, appearances in the dissolution cases in response to a notice served upon petitioners by receiver, the preparation and filing of the complaint in the Sangamon county court against the State auditor, and the filing of an answer in the Aetna Casualty Company interpleader suit.

From an examination of the evidence, it appears that the State auditor knew that petitioners had been retained, and was fully advised of the steps taken in the proposed reorganization. The services were ren-

dered in the utmost good faith, and there is no countervailing evidence to rebut the extent or reasonableness of the services rendered. We are of the opinion that petitioners' claim was properly allowed and the decree of the superior court is therefore affirmed.

*Decree affirmed.*

SCANLAN and SULLIVAN, JJ., concur.